# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SONEET KAPILA,

     Plaintiff,

v.                                                                Case No: 8:21-cv-2362-CEH

WARBURG PINCUS, LLC,
WARBURG PINCUS EQUITY FUND
IX, L.P. and ALLEN WISE,

     Defendants.

_____/

## **O R D E R**

This matter comes before the Court on the following *Daubert* motions filed pursuant to Rules 403 and 702, Federal Rules of Evidence, by Defendants Warburg Pincus, LLC; Warburg Pincus Equity Fund IX, L.P., and Allen Wise (collectively Defendants): Defendants' Motion to Exclude the Unqualified, Unreliable, and Speculative Opinions and Testimony of Plaintiff's Expert Peter R. Kongstvedt, M.D. (Doc. 30); Defendants' Motion to Exclude the Opinions and Testimony of Plaintiff's Expert, Attorney Stuart Cohn (Doc. 31); and Defendants' Motion to Limit and Exclude the Unreliable Opinions and Testimony of Plaintiff's Damages Expert Stanley Murphy (Doc. 38). Plaintiff, Soneet Kapila ("Plaintiff"), filed responses in opposition (Docs. 50–52), and Defendants replied (Docs. 59–61).  The Court, having considered the motions and being fully advised in the premises, will grant-in-part and deny-in-part

Defendants' motions to exclude Plaintiff's experts, Dr. Kongstvedt, Stuart Cohn, and Stanley Murphy.

## I.   BACKGROUND

This is an action for avoidance and recovery of alleged fraudulent transfers that was initiated as an adversary proceeding in Universal Health Care Group, Inc.'s ("Universal") bankruptcy. Debtor Universal provided health insurance and managed care products and services through the following wholly owned, operating subsidiaries: Universal Health Care, Inc. ("UHC"); Universal Health Care Insurance Company ("UHCIC"); and American Managed Care, LLC ("AMC") (collectively the "Regulated Subsidiaries"). Dr. Akshay M. Desai, M.D. was the chief executive officer, chairman of the board of directors, and majority shareholder of Universal. Doc. 2-253 at 3–4.

UHC was a health maintenance organization ("HMO") that had contracts with the Department of Health and Human Services ("DHS") and the Centers for Medicare and Medicaid Services ("CMS") to provide health care services to Medicare enrollees in various counties in Florida. *Id.* at 3. UHCIC operated Medicare private fee for service ("PFFS") plans and contracted with CMS to provide health care services to Medicare enrollees in twenty-three states and the District of Columbia. *Id.* AMC was a third-party administrator licensed to provide customer service, utilization management, provider service and credentialing, claims, enrollment and billing, accounting and management information services to UHC. AMC also provided its third-party administrator services to UHCIC. *Id.* at 3–4.

The primary focus of Universal and the Regulated Subsidiaries was the marketing, sale, and operation of Medicare Advantage ("MA") plans and Medicaid plans, which are health insurance plans offered by private companies that are regulated by the federal and state governments, which reimburse the provider companies for part or all of the costs of providing such insurance. *Id.* at 4. MA plans and the companies offering such plans are dependent on federal regulations, state-imposed cash reserve requirements, and funding levels for Medicare programs, and therefore are susceptible to fluctuations based on changing regulations and reimbursement rates authorized by CMS. *Id.* To comply with regulatory requirements regarding cash reserves for the Regulated Subsidiaries, Universal required a certain level of working capital. To satisfy its working capital needs, Universal sought and obtained funding from outside investors, including Defendants. *Id.*

On May 26, 2006, Warburg Pincus Equity Fund IX ("Warburg Equity IX"), Allen Wise ("Wise"), and Universal entered into a securities purchase agreement (the "Stock Purchase Agreement") whereby Warburg Equity IX and Wise agreed to purchase shares of Series A Convertible Preferred Stock (the "Preferred Stock") of Universal. *Id.* at 6. Warburg Equity IX agreed to pay Universal $29,000,000 for 11,143,871 shares of Preferred Stock, and Wise agreed to pay $1,000,000 for 384,271 shares of Preferred Stock. *Id.* at 6–7. About the same time, Warburg Equity IX and Universal entered into a loan and security agreement (the "Loan Agreement") whereby Warburg Equity IX agreed to loan up to $11,000,000 to Universal until the purchase of the Preferred Stock was consummated. *Id.* at 7. In between May and

August 2006, Warburg Equity IX loaned $6,200,000 to Universal pursuant to the Loan Agreement. *Id.* On August 17, 2006, the stockholders of Universal executed a stockholders' agreement (the "Stockholders Agreement") and Universal filed an Amended and Restated Certificate of Incorporation ("COI"). *Id.* at 8. The Stockholders' Agreement and the COI detailed the powers, rights, and preferences of Warburg Equity IX and Wise as holders of the Preferred Stock. *Id.* at 8–11. On August 18, 2006, Warburg Equity IX paid Universal $22,660,471, which along with the prior loan and accrued interest represented total paid in capital by Warburg Equity IX of $29,000,000, in return for 11,143,871 shares of Preferred Stock. *Id.* at 8. On or about the same date, Wise paid $1,000,000 to Universal in return for 384,271 shares of Preferred Stock. *Id.*

The Stockholders' Agreement provided Warburg Equity IX the right to have at least two of the seven members of the Universal Board of Directors ("the Board") appointed by Warburg Equity IX. *Id.* at 9. Joel Ackerman (a principal at Warburg) and Wise were initially appointed board members. *Id.* The Stockholders' Agreement required Board approval for various key actions, including, among other activities: selling, leasing or disposing of assets in excess of one million dollars; incurring indebtedness for borrowed money in excess of one million dollars; and capital expenditures in excess of two hundred fifty thousand dollars. *Id.* Additionally, under the COI, Warburg Equity IX and Wise, as the only holders of Preferred Stock, had a first claim to any equity value of Universal, a right to control whether others could own Preferred Stock, a right to receive quarterly dividends, and an optional right to

4

elect a redemption obligation for Universal to repurchase the Preferred Stock on or after August 17, 2011, subject to Delaware law and contingent upon Universal having sufficient capital reserves to fund the requested redemption. *Id.* at 10. The COI specified the formula for calculating the redemption price of the Preferred Stock.[1] *Id.* at 11.

In March 2007 Wise resigned from the Board, and two months later in May 2007, Ackerman resigned from the Board. *Id.* at 14. Plaintiff alleges that Dr. Desai accused Warburg of violating its fiduciary duties in resigning from the Board because it hampered Universal's ability to run the company. *Id.* Plaintiff alleges that in 2007, Warburg perceived significant problems with Universal and its operations. *Id.* at 15. As of September 2007, Warburg Equity IX internally valued its $29 million investment in Universal at $10 million. *Id.* at 16. By 2008 Warburg purportedly perceived Universal's performance to be highly unpredictable. *Id.* at 15. According to Plaintiff, in early 2008, Warburg advanced its goal to exit its investment in Universal, regardless of the impact on Universal. *Id.* at 14. Plaintiff alleges that by the end of 2008, Warburg's confidence in Universal's ability to raise capital was extremely low. *Id.* at 15. Warburg designated Tenno Tsai ("Tsai") as a representative on the Universal Board in 2007, and Tsai was replaced by Alok Sanghvi ("Sanghvi") in 2009. *Id.* at 15–16.

---

[1] According to Plaintiff, if Warburg Equity IX and Wise elected to redeem the Preferred Stock after August 17, 2011, the price for Universal to redeem the Preferred Stock would have exceeded fifty million dollars. Doc. 2-253 at 11.

Plaintiff alleges that shifts in the regulatory environment in 2009, including passage of the Medicare Physician Payment Reform Act and later the Affordable Care Act, resulted in lower profit margins for companies in the health care industry affected by the new legislation. *Id.* at 17. In a March 2009 quarterly evaluation report prepared by Warburg, it reduced the value of its investment to seven million dollars. *Id.* Although Universal's gross revenue increased from 2009 to 2010, medical claims grew in like amounts and reimbursement rates were reduced resulting in a decrease in profit margins from 17% to 11% during this period. *Id.* at 18. According to Plaintiff, despite Warburg's expertise in the healthcare space and its understanding of the impact of regulatory changes, it failed to disclose to anyone at Universal its assessment or valuation. *Id.*

After his appointment to the Universal Board in January 2009, Sanghvi purportedly continued overtures to redeem Warburg Equity IX and Wise's Preferred Stock prior to the August 2011 redemption date. *Id.* Plaintiff alleges Universal did not have sufficient capital surplus to redeem the Preferred Stock despite Warburg's urging that redemption was inevitable and in Universal's best interest. *Id.* at 19. Ultimately, Dr. Desai decided to move forward with negotiating an early redemption and designated Sandip Patel ("Patel"), secretary and general counsel for Universal, as Universal's representative to negotiate with Warburg. *Id.* Universal sought a loan to provide sufficient funds to meet Warburg's redemption demands. *Id.* In October 2010, Patel advised Sanghvi that a consortium of banks led by Wells Fargo (the "Lending Group") was considering Universal's request for debt financing. *Id.* at 20. In December

2010, Patel advised Sanghvi that Universal received a commitment from the Lending Group for a $37.5 million loan. *Id.* at 21.  In January 2011, the Universal Board voted to approve the debt financing. *Id.* at 22. On February 7, 2011, Universal, Warburg Equity IX, and Wise entered into a securities purchase agreement memorializing the Stock Redemption. *Id.* at 23. The Stock Redemption transaction closed in Florida on February 14, 2011, with Warburg Equity IX receiving $32,286,667 and Wise receiving $1,113,333, in satisfaction of the Stock Redemption. *Id.*

On February 6, 2013, Universal filed for Chapter 11 bankruptcy. *Id.* at 1. On April 22, 2013, Plaintiff Soneet Kapila was appointed as the Chapter 11 Trustee and is now the Liquidating Agent of Universal. In February 2015, Plaintiff initiated this adversary proceeding against Defendants Warburg Pincus, LLC; Warburg Pincus Private Equity Fund IX, L.P.; Allen Wise, and Alok Sanghvi seeking avoidance and recovery of alleged fraudulent transfers under Sections 544, 548, and 550 of the Bankruptcy Code and Chapter 726, Fla. Stat., and breach of fiduciary duties. Doc. 2-2. Plaintiff sought to avoid Universal's $33,400,000 redemption of the Preferred Stock owned by Warburg Equity IX and Wise. *Id.* at 1–2.

In a twenty-count Second Amended Complaint filed in November 2018, Plaintiff sues Defendants Warburg, Warburg Equity IX, and Wise for: Avoidance of Fraudulent Transfer of Property against Warburg Equity IX under 11 U.S.C. § 548(a)(1) (Count I); Avoidance of Fraudulent Transfer of Property as to Warburg Equity IX under 11 U.S.C. § 548(a)(1)(B) (Count II); Avoidance of Fraudulent Transfer of Property as to Warburg Equity IX under 11 U.S.C. § 544 and Fla. Stat. §

726.105(1)(b) (Count III); Avoidance of Fraudulent Transfer of Property as to Warburg Equity IX under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b) (Count IV); Avoidance of Fraudulent Transfer of Property as to Warburg Equity IX under 11 U.S.C. § 544 and Fla. Stat. § 726.106(1) (Count V); Recovery of Avoided Transfer as to Warburg Equity IX under 11 U.S.C. § 550 (Count VI); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 548(a)(1)(A) (Count VII); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 548(a)(1)(B) (Count VIII); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(a) (Count IX); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b) (Count X); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 544 and Fla. Stat. § 726.106(1) (Count XI); Recovery of Avoided Transfer as to Wise under 11 U.S.C. § 550 (Count XII); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 548(a)(1)(A) (Count XIII); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 548(a)(1)(B) (Count VXIV); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(a) (Count XV); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b) (Count XVI); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 544 and Fla. Stat. § 726.106(1) (Count XVII) Breach of Fiduciary Duty as to Warburg-Agency (Count XVIII); Breach of Fiduciary Duty as to Warburg Equity IX as Controlling Shareholder (Count XIX); and Breach of Fiduciary

Duty as to Warburg as Controlling Shareholder (Count XX). Doc. 2-253. Plaintiff alleges that the stock redemption was unfair to Universal and rendered Universal insolvent, saddled with debt financing, and left with unreasonably small capital. *Id.* at 24, ¶¶ 110–111.

Pretrial proceedings took place in the bankruptcy court, and on March 4, 2021, the parties filed a Joint Motion for Withdrawal of Reference of the adversary proceeding to the District Court for purposes of conducting a jury trial (Doc. 1-1), which was granted by the District Court on September 24, 2021 (Doc. 1-2.).

Defendants contend that Universal's financial decline and bankruptcy filed two years after the Stock Redemption were a result of poor management, delayed CMS payments, and equity distributions that occurred after the redemption transaction. Doc. 30 at 9. According to Defendants, they had no participation in Universal's business and operations after the redemption, and the claims by Plaintiff are brought in an effort to allegedly obtain an unwarranted windfall from Warburg.

Now before the Court are Defendants' three motions seeking to exclude Plaintiffs' experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993) and Federal Rules of Evidence 702 and 403. Docs. 30, 31, 38.

In Defendants' motion to exclude the opinions and testimony of Dr. Kongstvedt, Defendants argue that Dr. Kongstvedt's opinions on Universal's solvency and the financial impact of the redemption transaction lack expertise and reliability. Defendants additionally argue that Dr. Kongstvedt lacks qualifications and expertise

to opine on issues relating to fiduciary duties or the terms of the Wells Fargo loan. Doc. 30.

Plaintiff responds that Dr. Kongstvedt is qualified to offer the opinions in his report, as further explained in his deposition, based on his knowledge, skill, experience, training, and education. Plaintiff submits that Dr. Kongstvedt did not offer a solvency opinion and that his opinions regarding other healthcare executives and analysts are not *ipse dixit* as argued by the defense. Plaintiff argues that Dr. Kongstvedt is qualified to opine as to the standards, customs, and practices of directors and board of directors in the health insurance and managed care industries because he has successfully worked in those industries for decades, his opinions will assist the trier of fact, and he may opine on ultimate issues of fact. Finally, Plaintiff asserts that Dr. Kongstvedt may properly opine on how the terms of the Wells Fargo loan will negatively affect the Debtor because that is his area of expertise having taught, wrote, and consulted regarding the effect of external factors on the health of a company in the health insurance industry. Doc. 52.

Defendants next move to exclude Plaintiff's expert, Stuart Cohn, a retired law professor. Doc. 31. Plaintiff offers Professor Cohn as an expert on Delaware law to set forth the relevant corporate governance standards, practice, and obligations in support of Plaintiff's argument that Sanghvi breached fiduciary duties to Universal, and issues related to Warburg being a control shareholder of Universal. Defendants argue Professor Cohn lacks experience related to corporate governance standards and practices with private equity firms or the health insurance industry, and Defendants

10

submit that his opinions regarding corporate obligations amount to impermissible legal conclusions and statements of law.

Plaintiff responds in opposition (Doc. 51) denying that Professor Cohn seeks to instruct the jury on the law or to espouse legal conclusions. Plaintiff argues that Defendant's motion mischaracterizes the scope and nature of Professor Cohn's opinions.[2] Plaintiff submits that Professor Cohn, relying on his nearly 40 years of teaching, researching and consulting experience, may appropriately opine as to relevant corporate governance standards, practices, and obligations.

Finally, Defendants move to exclude testimony and opinions of Plaintiff's damages expert, Stanley Murphy, as it relates to Murphy's second opinion regarding "deepening insolvency." Doc. 38. Defendants argue Murphy's theory improperly relies on his own post-hoc recasting of Universal's projections and improperly fails to attribute any net loss to a cause other than the Defendants, despite Defendants' lack of a relationship with Universal the last 18 months before Universal filed bankruptcy.

Plaintiff responds that to the extent Murphy's analysis is flawed due to adjustments Defendants claim he made, Plaintiff submits that the same flaw exists in the valuation and insolvency analysis of defense expert Ian Ratner. Doc. 50. Additionally, regarding Defendants' argument that Murphy failed to consider any

---

[2] According to Plaintiff, Professor Cohn is not offering opinions that Mr. Sanghvi breached his fiduciary duty (Doc. 51 at 4); regarding whether Warburg is a control shareholder (Doc. 51 at 13); or on issues related to preferred stock redemptions, loan transactions, industry norms, various financial considerations, health care, private equity investments, and minority stockholder agreements (Doc. 51 at 8)

alternative causes for Universal's insolvency, Plaintiff submits such argument improperly attempts to introduce a comparative fault affirmative defense against Plaintiff's breach of fiduciary duty claim. *Id.* at 8.

## II.   LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 is a codification of the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court described the gatekeeping function of the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." *Id.* at 589; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*). The Supreme Court extended its reasoning in *Daubert* to non-scientist experts in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

In performing its gatekeeping function, the Court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry

mandated in *Daubert*, and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Thus, the three discrete inquiries to determine the admissibility of expert testimony are qualifications, relevance, and reliability. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1341 (11th Cir. 2003). Although there is some overlap among these inquiries, they are distinct concepts that the Court and litigants must not conflate. *Id.*

"The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004) (citation omitted). "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1113 (11th Cir. 2005). The admission of expert testimony is a matter within the discretion of the district court, which is afforded considerable leeway in making its determination. *Frazier*, 387 F.3d at 1258.

"The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786. The judge's role is to keep unreliable and irrelevant information

13

from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999).

## III.   DISCUSSION

### A.   Dr. Peter Kongstvedt

In his report, Dr. Kongstvedt offers the following opinions:

> My overall conclusion and opinion is that Warburg Pincus' (WP's) decision to require a redemption and the attendant method of achieving that redemption, meaning the Well Fargo (WF) loan and that loan's covenants and terms including the rapid amortization schedule and statutory capital multiplier, in conjunction with the changing statutory and regulatory environment, put Universal at an unreasonable risk of default, and thereby unreasonably increased Universal's risk of failure, all of which was known or should have been known to WP at the time of the transactions. I express additional opinions in the body of my report. I have not undertaken any effort to investigate or express any opinions other than those expressed in the report.

Doc. 30-2 at 7–8.

### 1.   Qualifications

The first question under *Daubert* is whether the proposed expert witness is qualified to testify competently regarding the matters he or she intends to address. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998). Defendants argue Dr. Kongstvedt is not qualified to offer his stated opinions because they are based on his personal perspective of business operations and policy. Doc. 30 at 6. This reason alone is insufficient to exclude an expert's opinions. Plaintiff is correct that an

expert may be qualified based on experience standing alone. *See U.S. v. Frazier*, 387 F.3d 1244, 1260–61 (11th Cir. 2004); *see also* Fed. R. Evid. 702 (An expert may be qualified "by knowledge, skill, experience, training, or education."). As courts have noted, "[t]he qualification standard for expert testimony is 'not stringent' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted); *see also Hewitt v. Liberty Mut. Grp., Inc.*, 268 F.R.D. 681, 686 (M.D. Fla. 2010).

Defendants argue that Dr. Kongstvedt's opinions on insolvency and the impact of the redemption transaction must be excluded because he lacks the expertise to opine on Universal's insolvency. Doc. 30 at 14–16. In response, Plaintiff submits that Dr. Kongstvedt is not offering a solvency opinion. Doc. 52 at 4–6. He readily admits he is not a CPA, actuary, or financial expert. According to Plaintiff, Dr. Kongstvedt is offering opinions related to solvency from the viewpoint of his expertise in operations, business practices, and health policy, and not offering a determination as to whether Universal was solvent at any given time. *Id.* at 5.

As argued by Defendants, and admitted by Plaintiff, Dr. Kongstvedt lacks the expertise to opine on the issue of solvency. Thus, to the extent that Dr. Kongstvedt is offering opinions as to the ultimate cause of Universal's insolvency, Dr. Kongstvedt lacks the expertise to offer such causation opinion. Although Plaintiff acknowledges Dr. Kongstvedt's lack of financial expertise, Dr. Kongstvedt responded in deposition that the redemption of the preferred stock appeared to be "a fatal blow short of the

15

company being acquired by an angel or something." Doc. 30-3 at 308:6–8. Such ultimate causation opinion regarding Universal's demise is outside of Dr. Kongstvedt's expertise. However, this does not preclude Dr. Kongstvedt from being able to offer opinions, based upon his professional experience, regarding regulations and standards in the health care industry as it relates to and impacts companies in this industry, MA plans, plan pricing, Florida's statutory capitalization requirements for the relevant plans, costs associated with MA plans, regulation of MA plans, and components that affect payment of MA plans.

Dr. Kongstvedt is a non-practicing licensed physician board-certified in internal medicine. He has thirteen years' experience at the senior-most levels of management of HMOs, commercial health insurers and Blue Cross Blue Shield plans. He spent fifteen years as a partner or senior executive at consulting firms Ernst & Young, Capgemini, and Accenture, with a special focus on managed care, and has ten years practical experience as an independent consultant in health insurance and managed care and policy. Doc. 30-2 at 6–7. The Court finds that Dr. Kongstvedt's professional experience and training are sufficient to meet *Daubert's* lenient standard. *See Clena Invs., Inc. v. XL Specialty Ins.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (explaining that the qualifications "inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility").

Additionally, the Court finds that Dr. Kongstvedt's testimony will be helpful to the trier of fact insofar as his opinions are offered to help the jury understand the

16

background and history of the MA program, private fee-for-service (PFFS) plans, costs associated with such plans, the regulatory framework applicable to Universal, statutory changes in the healthcare industry, and the impact of those changes on MA and PFFS plans and on Universal. In that regard, Dr. Kongstvedt's opinions will assist the jury in understanding the policy, operations, strategies, and management in the industry at issue in this case. However, Dr. Kongstvedt may not offer an opinion as to the ultimate financial demise of Universal as Dr. Kongstvedt is not qualified as an accountant, CPA, actuary, lender, or financial expert. *See, e.g., Delta T, LLC v. Dan's Fan City, Inc.*, No. 8:19-CV-1731-VMC-SPF, 2021 WL 458022, at *3 (M.D. Fla. Feb. 9, 2021) (excluding industrial design expert's opinions on corporation's lost profits where he was not an expert in accounting, business, or finance). Additionally, Dr. Kongstvedt, who is not a lender or financial expert, lacks the qualifications to opine on the financial details related to the terms of the Wells Fargo loan.

Defendants also challenge the qualifications and expertise of Dr. Kongstvedt to opine on issues relating to fiduciary duties owed by Sanghvi, Warburg Equity IX's appointed board representative. Doc. 30 at 22–25. Defendants argue that Dr. Kongstvedt is not a lawyer, has never testified as an expert regarding fiduciary duties, and his responses are evasive. While the Court agrees that Dr. Kongstvedt should not be offering legal opinions, review of the testimony cited in Defendants' motion reflects that Dr. Kongstvedt does not appear to be offering legal opinions regarding whether there was a breach of fiduciary duty by Defendants' executives. *See* Doc. 30 at 23 (citing Kongstvedt's Depo at 103:2–103:18; 100:4–101:13).

17

As discussed in Plaintiff's response, however, Dr. Kongstvedt has decades of experience serving on, teaching, and interacting with boards of directors. The Court finds such experience makes him at least minimally qualified to opine on the standards, customs, and practices of directors and boards of directors in the health insurance and managed care industries, and those opinions will not be excluded.

   2.   Methodology

The second prong of the *Daubert* analysis considers whether Dr. Kongstvedt's methodology is reliable. "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Frazier*, 387 F.3d at 1262 (citing Fed. R. Evid. 702, Advisory Committee Notes (2000)). There are four non-exhaustive factors district courts consider in evaluating reliability:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

*Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). A district court can take other relevant factors into account as well. *Id.* (citations omitted).

"If the [expert] witness is relying solely or primarily on experience, then," in establishing reliability, as is the case here, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis

for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (citation and internal quotation marks omitted). The Court's analysis as to reliability "focus[es] 'solely on principles and methodology, not on the conclusions that they generate.'" *Seamon*, 813 F.3d at 988 (citation omitted).

Defendants challenge, as unsupported by a reliable methodology, Dr. Kongstvedt's opinion that the Wells Fargo loan caused an unreasonable risk for Universal to become insolvent. Defendants argue that Dr. Kongstvedt's failure to consider available, relevant information, particularly factors that occurred in the two years after the stock redemption up until the bankruptcy was filed, renders his opinions unreliable. As noted above, Dr. Kongstvedt may not opine on the ultimate cause of Universal's demise, however, his experience lends itself to be able to opine on factors that impact the financial stability and capital securitization requirements of a company, like Universal, that provides health insurance and managed care products and services.

The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)). How a court evaluates reliability will vary from case to case, but in all cases of proffered expert testimony, the court must find that it is "properly grounded, well-reasoned, and not speculative before it can be admitted." *Id.* at 1262 (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)).

Based on Dr. Kongstvedt's professional experience, he is qualified to opine on industry factors that impact Universal's ability to satisfy its statutory capitalization

requirements, including factors such as statutory changes, and costs and payments associated with MA plans. In his report, he methodically explains the history and statutory regulations associated with MA plans. He discusses the statutory capital requirements for the plans at issue and how such security is impacted by the growth of a health plan and other industry factors. He discusses growth-related problems, particularly in PFFS plans, stemming from increases in costs of sales and marketing and the ability of the company's information technology to keep up with the growth. With this backdrop, Dr. Kongstvedt analyzes Universal's pricing strategy, growth, expansion, and statutory capitalization requirements in the context of the Wells Fargo loan debt acquired to fund the redemption. Whether Dr. Kongstvedt failed to consider other factors such as post-redemption dividends, poor management decisions, or questionable actions of executives, goes to the credibility and weight of Dr. Kongstvedt's opinions, and not to their admissibility. As stated by the Court in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Defendants will have a full opportunity to cross examine Dr. Kongstvedt regarding all the material factors they submit he failed to take into consideration in reaching his opinions.

The Court agrees that Dr. Kongstvedt's opinions regarding the terms of the Wells Fargo loan, to the extent he seeks to offer financial projections, do not pass muster under *Daubert*. As noted above, Dr. Kongstvedt is not a CPA, actuary, lender, or financial analyst. Thus, he lacks the necessary qualifications to opine on financial

projections. Additionally, he has not employed any reliable methodology. Admittedly, he did not consider the financial projections performed by Universal's management and he did not perform his own analysis or renderings regarding financial projections as it relates to the Wells Fargo loan. He does not perform financial projections as part of his professional experience. Dr. Kongstvedt testified that Stan Murphy, Plaintiff's accountant expert, was performing the analysis and modeling concerning Universal's financial projections with respect to the Wells Fargo loan covenants. Thus, in addition to not being qualified to offer such opinions, any proposed testimony by Dr. Kongstvedt as it relates to financial projections and the Wells Fargo loan would be cumulative of Stan Murphy's opinions.

Defendants also challenge, as unreliable, any opinion by Dr. Kongstvedt related to what healthcare executives knew or should have known about risks in the health insurance industry from 2009 to 2014. Defendants argue that such opinions are speculative and not the proper subject of expert testimony.

Plaintiff responds that Dr. Kongstvedt reliably explains how his practical experience working, teaching, and consulting in the health insurance and managed care industries leads to the conclusions he reaches about how and why Defendants knew or should have known certain facts related to the operation of a company in the highly complex and highly regulated health insurance industry. Defendants' arguments focus more on the conclusions reached by Dr. Kongstvedt, as opposed to challenging his methodology. Dr. Kongstvedt adequately explains how his experience

leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts

The motion to exclude Dr. Kongstvedt is granted, in part, to the extent that Dr. Kongstvedt is precluded from offering opinions regarding the ultimate cause of Universal's insolvency and opinions pertaining to financial projections related to the Wells Fargo loan. In all other respects, the motion to exclude the opinions and testimony of Dr. Kongstvedt is denied.

## B.   Professor Stuart Cohn

Professor Stuart Cohn was retained by the Trustee to opine on three issues: (1) the fiduciary duties of directors appointed by Warburg to the Universal board; (2) the agency principles regarding Warburg for acts and omissions of its appointed directors serving on the Universal board; and (3) obligations of control shareholders if it is determined that Warburg Pincus or Warburg Equity IX was a control shareholder of Universal. Doc. 31-1 at 4.  Doc. 51 at 24.

Defendants argue Professor Cohn's opinions should be excluded because he is not qualified to opine on the issues relevant to this litigation and may not testify as to legal opinions. Defendants contend that Professor Cohn's claimed expertise of analyzing Delaware corporate law invades the province of the jury, is unfairly prejudicial, is not helpful to the jury, and is not probative of the issues before the Court. Doc. 31.

Plaintiff responds that Defendants mischaracterize the scope and substance of Professor Cohn's proffered opinions. Doc. 51 at 2. Plaintiff clarifies that Professor

Cohn's report does not instruct the jury on the law, nor does he purport to offer any legal conclusions. Rather, Plaintiff contends that Professor Cohn's opinions are relevant to corporate governance[3] standards, practices, and obligations that are at issue in the case.

1.  Qualifications

Defendants first argue that Professor Cohn is unqualified to opine on the subject matter of this dispute as he has no expertise with private equity investments and minority stockholder agreements. Because Cohn has not represented, worked for, been on the board of a company with private equity investments, or consulted a private equity firm, Defendants submit Cohn lacks the requisite expertise to opine on the issues in this case. Additionally, Defendants argue that Delaware law is not an appropriate subject of expert testimony.

Stuart Cohn is an Emeritus Professor of Law at the Levin College of Law, University of Florida. From 1977 until 2016, he taught and researched company law, including all forms of business enterprise, agency law, and securities regulation. He has written extensively in those areas of the law. The principal law school courses he taught include Corporations, Unincorporated Business Enterprises, Securities Regulation, and Franchise Regulation. These courses analyze conflict of interest

---

[3] "Corporate governance is the system of rules, practices, and processes by which a firm is directed and controlled. Corporate governance essentially involves balancing the interests of a company's many stakeholders, such as shareholders, senior management executives, customers, suppliers, financiers, the government, and the community." *See* https://www.investopedia.com/terms/c/corporategovernance.asp (last accessed Sept. 19, 2022).

transactions, principal and agency relationships, and the fiduciary duties of directors, officers and control shareholders. He has been on the Executive Council of the Business Law Section of the Florida Bar for over 25 years and has been closely involved in the analysis and drafting of legislation affecting Florida corporations and other business entities. From 1966 until 1977, he practiced law in Chicago specializing in corporate and securities law. Professor Cohn has testified as an expert in state and federal courts regarding corporate and other business entities.[4] Doc. 51 at 22–23.

Given Professor Cohn's experience professionally and in academia, the Court finds that Professor Cohn is at least minimally qualified to opine on corporate governance standards, practices, and obligations that are at issue in this case. The Court is mindful that its "gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (quoting *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999)).

Defendants are correct, however, that testifying experts may not offer legal conclusions at trial. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla*., 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) (quoting *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977) ("courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law")). And, specifically, it would be inappropriate here for

---

[4] Plaintiff clarifies that Professor Cohn is not offering opinions on the issues of preferred stock redemptions, loan transactions, industry norms, various financial considerations, health care, private equity investments, and minority stockholder agreements. Doc. 51 at 8–9.

Professor Cohn to opine as to whether Defendants' conduct constituted a breach of fiduciary duties. *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) ("Such testimony is a legal opinion and inadmissible. Whether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide.").

Review of Professor Cohn's report and Plaintiff's response reveals that the expert is not intending to offer the legal opinion that Sanghvi or any other Warburg executive breached fiduciary duties. Rather, Professor Cohn, based upon his professional and academic experience, seeks to identify for the Court and the jury the testimony and evidence relevant to the issues of fiduciary duties, potential conflicts of interest, and whether Warburg Pincus or Warburg Equity IX are control shareholders. An expert witness may testify as to his opinion on an ultimate issue of fact, but he "may not testify as to his opinion regarding ultimate legal conclusions." *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009); *see also* Fed. R. Evid. 704(a).

Defendants next contend that Professor Cohn is unqualified to testify regarding whether there were "financial dangers" associated with Universal's financing. Doc. 31 at 11–14. Given the dearth of Professor Cohn's financial experience, Defendants argue that any comment regarding "financial dangers" is beyond this witness's knowledge. Defendants claim that the only source of the opinion is the cherry-picked statement from an email that "the amortization is ugly," and Defendants submit that Cohn makes the improper leap to concluding that knowing a transaction is dangerous and taking no steps to prevent it can be a breach of a fiduciary duty. Defendants also accuse

25

Cohn of providing inconsistent testimony regarding the issue. Plaintiff responds that Professor Cohn did not distort the facts or take the statements out of context.

Professor Cohn's report does not offer opinions directed to the financial status of Universal. Rather, his opinions are directed to the information within Warburg's knowledge, such as Warburg's internal evaluation of Universal or Sanghvi's interests in Warburg getting out of Universal, as factors to consider in whether Sanghvi violated his duty of loyalty to Universal when he failed to share that information with Universal. Whether Professor Cohn failed to take into consideration other information from the Sanghvi email or whether his testimony was contradictory on this issue are matters for cross examination and are not a basis to exclude the opinions. *See, e.g., Exim Brickell LLC v. Bariven, S.A.*, No. 09-CV-20915, 2011 WL 13131317, at *5 (S.D. Fla. Mar. 11, 2011) (finding contradictions or concessions in expert's testimony go toward the weight of the evidence put forth by the expert, not toward its admissibility).

Defendants additionally argue that Professor Cohn is unqualified to testify whether the terms of the 2006 Stockholders Agreement constitute control and submits that certain of his opinions contradict Delaware law. According to Defendants, Professor Cohn testified that the power of the veto clause[5] contained in the stockholder agreement is equivalent to control. And yet, according to Defendants, Professor Cohn did not know that such a protective clause is common in minority shareholder

---

[5] The stockholder agreement included language that Warburg's designated director be given notice and the right to approve any Universal debt raise in an amount greater than one million dollars.

agreements and in the private equity industry in general, thereby undermining his opinions regarding control. Citing Delaware caselaw to refute Professor Cohn's opinion that the contractual terms in the stockholder agreement amounted to "control," Defendants contend that under Delaware law, the "contractual rights held by a non-majority stockholder do not equate to control, even where the contractual rights allegedly are exercised by the minority stockholder to further its own goals." Doc. 31 at 17 (quoting *Thermopylae Cap. Partners, L.P. v. Simbol, Inc.*, No. CV 10619-VCG, 2016 WL 368170, at *13 (Del. Ch. Jan. 29, 2016)).

On the issue of control, Plaintiff responds that Professor Cohn's opinions do not misstate Delaware law, and in any event, the Cohn Report does not purport to offer the legal conclusion that Warburg is a control shareholder. Doc. 51 at 12–13. Plaintiff submits that Delaware caselaw provides that a stockholder need not show day-to-day oversight in order to establish control. *Id.* at 13 (citing *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006)). Additionally, Plaintiff cites Delaware caselaw for the proposition that a 43% stockholder was nevertheless found to be a control shareholder where the minority stockholder exercised domination through control of corporation conduct. Doc. 51 at 14 (citing *Kahn v. Lynch Commun. Sys., Inc.*, 638 A.2d 1110 (Del. 1994)). Plaintiff notes that in *Kahn*, the minority shareholder was subject to entire fairness review instead of business judgment review due to the minority shareholder's status as a control shareholder. *Id.*

As evidenced by the parties' arguments and by Delaware law, whether a minority stockholder is controlling is a fact-intensive inquiry determined on a case-by-

case basis. *See, e.g.*, *In re Crimson Expl. Inc. Stockholder Litig.*, No. CIV.A. 8541-VCP, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014) (discussing a significant number of cases that examine whether a minority stockholder exercised control over a corporation, noting that the cases do not reveal any sort of linear, sliding-scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder, and emphasizing that "the scatter-plot nature of the holdings highlights the importance and fact-intensive nature of the actual control factor"). What is certain is that Professor Cohn may not opine as to what Delaware law states; that is the role of the Court. Further, Professor Cohn may not offer legal opinions as to whether Warburg is a control shareholder. However, Professor Cohn may opine as to relevant factors in the testimony and evidence that are to be considered on the issue of control.

Defendants argue that Professor Cohn is not qualified to opine on Warburg's 2009 estimate or "superior information" in loan negotiations. Cohn asserts that Sanghvi withheld "superior information" from Universal in its negotiations with Wells Fargo and in conjunction with the stock redemption. Defendants contend that the March 2009 valuation was an internal document that Sanghvi testified was a guestimate, which turned out to be wrong. According to Defendants, it was a useless predictor of market value and was stale by February 2011 when the redemption occurred. Defendants note Cohn did not do any research into the economy in 2009, even though it was during a Great Recession. Defendants argue there is no authority under Delaware law that a private equity investor had to turn over its internal

guestimates. Defendants further argue that the Delaware Supreme Court reinforces this same principle that estimates for accounting purposes are immaterial and need not be disclosed. Doc. 31 at 20 (citing *Klang v. Smith Food & Drug Ctrs.*, 702 A.2d 150, 157 (Del. 1997)).

First, Plaintiff responds that Professor Cohn is not purporting to base his opinions on the status of the economy in 2009. Doc. 51 at 9. Next, Plaintiff refutes that the 2009 $5 million valuation by Warburg of its stock in Universal was simply a "placeholder" or guestimate. Plaintiff points to the testimony of Elizabeth "Bess" Weatherman, Warburg's managing director and supervisor of Sanghvi, who testified that the March 2009 $5 million valuation was still appearing on Warburg's books in October 2010. Plaintiff submits Warburg's valuation of its Universal stock was material; Warburg disagrees. As noted above, the Court finds Professor Cohn may opine as to relevant factors in the testimony and evidence on the issue of control. Accordingly, with the caveat that Professor Cohn may not offer legal opinions, the Court declines to exclude Professor Cohn as an expert.

Defendants additionally argue that Professor Cohn is unqualified to opine on witness credibility. Doc. 31 at 21–23. According to Defendants, despite stating he had no basis to dispute the testimony of Sanghvi and Weatherman, Cohn nevertheless disregarded Sanghvi's testimony in reaching his opinion that Sanghvi breached his fiduciary duty.

First, Professor Cohn is not offering an opinion that Sanghvi breached his fiduciary duties. Doc. 51 at 4.  Rather, he opines as to factors to be considered, based

on the evidence, when determining whether a breach of fiduciary duty occurred. Second, to the extent that Cohn considers some witnesses' testimony while rejecting others in formulating his opinions, these omissions go to the weight of the testimony and can be challenged on cross examination; they do not support a basis for excluding the opinions. Any alleged inadequacies in the expert's analysis may be tested on cross-examination and through competing expert testimony *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 765019, at \*26 (N.D. Fla. Feb. 28, 2021) (citation omitted). Here, Defendants have offered their own expert to challenge Professor Cohn and to opine on matters of corporate governance.[6]

    2.   <u>Methodology</u>

Turning to the second prong in the *Daubert* analysis, Defendants argue that even if Professor Cohn is qualified, his opinions should be excluded because he does not offer any methodology, but rather bases his opinions on merely experience and training. Doc. 31 at 23–26. And again, Defendants challenge Cohn's opinions because Cohn failed to credit Sanghvi or Weatherman's testimony. Defendants accuse Cohn of offering conclusory opinions that are unhelpful to the jury.

As discussed above, an expert may rely solely on his experience in reaching his opinions, provided the witness explains "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that

---

[6] Plaintiff has moved to limit or exclude the testimony of defense proposed expert Norman Veasey offered to refute the opinions of Professor Cohn on the issues related to breach of fiduciary duty, Warburg's internal valuation process, and controlling shareholder. Doc. 45.

experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702). Plaintiff responds that Professor Cohn has reviewed, in the context of his experience with corporate governance standards, practices and obligations at issue in this case, the pertinent documents, testimony, and principles relevant to the actions of Warburg's appointed directors to the Universal board and the obligations of control shareholders if it is determined that Warburg was a control shareholder. Additionally, he has analyzed the issues impacting conflicts of interest and agency relationship. Professor Cohn explains how his experience leads to the conclusions reached, why that experience is a sufficient basis for his opinions, and how that experience is applied to the facts. Professor Cohn sufficiently explains his methodology, and thus, the second prong is satisfied.

### 3.   Helpfulness to the Jury

To satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (11th Cir. 2004). Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997). Because the relevant corporate governance standards, practices, and obligations are not "common knowledge," Professor Cohn's opinions, provided they are not legal conclusions, will be helpful to the trier of fact. Subject to the limitation

31

that no legal conclusions are permitted, the motion to exclude the testimony of Professor Cohn will be denied.

### C.   Stanley Murphy

Plaintiff's damages expert, Stanley Murphy ("Murphy"), is a certified public accountant, certified in Financial Forensics, who has spent a substantial portion of his thirty years of professional experience performing accounting and economic analyses, investigations, valuations, insolvency analyses, and business damage analyses for entities. His experience in damages calculations and insolvency assessment matters includes cases in the health care industry. Doc. 38-6 at 7–8.

Murphy sets forth a summary of six opinions in his October 4, 2019 report. *Id.* at 9–10. In pertinent part, Murphy opines that total damages for Defendants' breach of duty using the deepening insolvency method, assuming Defendants' liability, is $146.8 million before prejudgment interest. *Id.* at 10. Defendants move to limit the deepening insolvency opinion of Murphy, on the basis that the opinion ignores other relevant evidence, the methodology of hindsight is improper and unreliable, and because Murphy ignores any possible cause other than the stock redemption. Doc. 38. Plaintiff opposes the motion. Doc. 50. Defendants' motion does not challenge Murphy's qualifications, and thus, the Court turns to the second prong of the *Daubert* analysis.

Defendants first argue that Murphy's calculation of damages based on a deepening insolvency theory fails to pass muster under *Daubert* and Federal Rule of Evidence 702 because he relies upon hindsight projections in his analysis. Murphy

opines that the losses sustained in the 18 months following the stock redemption are solely attributable to Defendants' actions based on facts that could not have been known at the time of the redemption. According to Defendants, fatal to Murphy's analysis is the initial assumption that Plaintiff's counsel asked Murphy to assume that a deepening insolvency method is an appropriate method for calculating damages in this case. As such, Murphy predicated his analysis on the assumption that Universal was insolvent the day after its redemption of Warburg IX and Wise's stock. Defendants vehemently challenge this assumption, noting that testimony of fact witnesses demonstrates that Universal was solvent following the redemption transaction. Doc. 38 at 15, n.6. Defendants also criticize Murphy for recasting Universal's contemporaneous projections and ignoring testimony by management about the company's financial performance. Finally, Defendants claim Murphy failed to consider amounts that would have been paid to Universal in 2015 and 2016 on 2012 CMS contracts. Further, by starting his calculations on June 1, 2011, Murphy purportedly excludes over four million dollars in net income generated in the three and one-half months following the February 2011 redemption.

Plaintiff responds that there is support in the facts and the caselaw that deepening insolvency damages may accrue up to the bankruptcy petition. Doc. 50 at 3. Further, to the extent that Defendants challenge Murphy's opinions based on adjustments to projections, Plaintiff submits that defense expert Ian Ratner may be challenged on the same basis. As it relates to Murphy's failure to consider other causes, Plaintiff argues that some are irrelevant as improperly injecting a comparative fault

affirmative defense against Plaintiff's breach of fiduciary duty, which Plaintiff asserts is an intentional tort.

Defendants' challenges, for the most part, are matters that go to the weight of Murphy's opinions and not their admissibility. The one issue that gives the Court pause is the opinion's assumption that Universal was insolvent the day after its redemption of Warburg IX and Wise's stock.[7] Defendants urge that testimony they intend to rely on in support of their forthcoming summary judgment motion demonstrates the falsity of this assumption. First, Defendants fail to specifically identify or file the evidence upon which they rely for this argument. Second, even if they did, to the extent there is contradictory testimony on the issue, such disputes in the evidence do not support the wholesale exclusion of an expert's testimony or opinions related to the matter.

To the extent that Murphy's assumptions regarding Universal's insolvency or Defendants' breaches are unsupported by the evidence at trial, Defendants may object to that testimony at trial. Accordingly, the motion to exclude Murphy's testimony and opinions regarding calculation of damages based on a deepening insolvency theory will be denied, without prejudice, subject to Defendants' ability to renew their motion at trial in the event Plaintiff fails to lay the proper factual predicate for introduction of Murphy's opinions on this issue.  It is hereby

---

[7] Defendants also argue that Murphy's deepening insolvency opinion is predicated on the assumption that Plaintiff can prove all issues of Defendants' duty and breach. Doc. 38 at 16, n.7.

**ORDERED**:

1.      Defendants' Motion to Exclude the Unqualified, Unreliable, and Speculative Opinions and Testimony of Plaintiff's Expert Peter R. Kongstvedt, M.D. (Doc. 30) is **GRANTED in part** and **DENIED in part** as set forth herein.

2.      Defendants' Motion to Exclude the Opinions and Testimony of Plaintiff's Expert, Attorney Stuart Cohn (Doc. 31) is **GRANTED in part** and **DENIED in part** as set forth herein.

3.      Defendants' Motion to Limit and Exclude the Unreliable Opinions and Testimony of Plaintiff's Damages Expert Stanley Murphy (Doc. 38) is **DENIED, without prejudice,** as set forth herein.

4.      The parties' motions for summary judgment are not due until 30 days after the Court issues a ruling on Plaintiff's pending *Daubert* motions at Docs. 41–45, 47.

**DONE AND ORDERED** in Tampa, Florida on September 23, 2022.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any