## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SONEET KAPILA,

     Plaintiff,

v.                                  Case No: 8:21-cv-2362-CEH

WARBURG PINCUS, LLC,
WARBURG PINCUS EQUITY FUND
IX, L.P. and ALLEN WISE,

     Defendants.

_____/

## **O R D E R**

This matter comes before the Court on the following *Daubert*[1] motions filed pursuant to Rules 403 and 702, Federal Rules of Evidence, by Plaintiff, Soneet Kapila ("Plaintiff"): Motion to Exclude the Opinions and Trial Testimony of Defendants' Expert, L. Lamar Blount (Doc. 41); Motion to Exclude the Opinions and Trial Testimony of Defendants' Expert, Henry Fishkind (Doc. 42); Motion to Exclude from Trial Opinions of Defendants' Expert, Samuel J. Hewitt, Regarding (I) Purported Lack of Credibility of Plaintiff's Expert Peter R. Kongstvedt, M.D. or (II) Any Opinion in his Expert Report as Unsupported or Unreliable (Doc. 43); Motion to Exclude from Trial Opinions of Ian Ratner Regarding (I) Opinions Offered by Dr. Fishkind, (II) the Marshall Stevens Valuation, (III) 2015 and 2016 Payments from CMS on Account of 2012 MRA Receivables, and (IV) the Soundness and Thoroughness of the

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Underwriting and Due Diligence of Wells Fargo and the Consortium of Banks for the Loan that Closed on February 14, 2011 (Doc. 44); Motion to Exclude the Opinions and Trial Testimony of Defendants' Expert, E. Norman Veasey (Doc. 45); and Motion to Exclude the Opinions and Trial Testimony of Defendants' Expert, Richard B. Gaudet (Doc. 47). Defendants, Warburg Pincus, LLC; Warburg Pincus Equity Fund IX, L.P., and Allen Wise (collectively Defendants), filed responses in opposition (Docs. 53–58), and Plaintiff replied (Docs. 62–67). The Court, having considered the motions and being fully advised in the premises, will deny the Plaintiff's motions to exclude the opinions and testimony of Blount, Fishkind, Hewitt, Ratner, and Gaudet, and grant-in-part and deny-in-part Plaintiff's motion to exclude the opinions and testimony of Veasey.

## I.    BACKGROUND

This is an action for avoidance and recovery of alleged fraudulent transfers that was initiated as an adversary proceeding in Universal Health Care Group, Inc.'s ("Universal") bankruptcy. Debtor Universal was a Delaware corporation headquartered in St. Petersburg, Florida. Universal was a holding company formed in March 2006 pursuant to a merger whereby ownership of Universal Health Care, Inc. ("UHC") was transferred from the existing shareholders to Universal in exchange for an ownership interest in Universal. The shareholders of UHC at the time of the merger were the Desai Limited Partnership ("DLP") and Zachariah P. Zachariah, M.D. Universal provided health insurance and managed care products and services through the following wholly owned, operating subsidiaries: UHC; Universal Health Care

2

Insurance Company ("UHCIC"); and American Managed Care, LLC ("AMC") (collectively the "Regulated Subsidiaries"). Dr. Akshay M. Desai, M.D. was the chief executive officer, chairman of the board of directors, and majority shareholder of Universal until the appointment of the Bankruptcy Trustee. Doc. 2-253 at 3–4.

Incorporated in 2002, UHC was a health maintenance organization ("HMO") that had contracts with the Department of Health and Human Services ("DHS") and the Centers for Medicare and Medicaid Services ("CMS") to provide health care services to Medicare enrollees in various counties in Florida. *Id.* at 3. UHCIC was incorporated in 2006 and operated Medicare private fee for service ("PFFS") plans and contracted with CMS to provide health care services to Medicare enrollees in twenty-three states and the District of Columbia. *Id.* AMC was formed in 2002 as a third-party administrator to UHC. AMC also provided its third-party administrator services to UHCIC. *Id.* at 3–4.

The primary focus of Universal and the Regulated Subsidiaries was the marketing, sale, and operation of Medicare Advantage ("MA") plans and Medicaid plans, which are health insurance plans offered by private companies that are regulated by the federal and state governments, which reimburse the provider companies for part or all of the costs of providing such insurance. *Id.* at 4. MA plans and the companies offering such plans are dependent on federal regulations, state-imposed cash reserve requirements, and funding levels for Medicare programs, and therefore are susceptible to fluctuations based on changing regulations and reimbursement rates authorized by CMS. *Id.* To comply with regulatory requirements regarding cash reserves for the

Regulated Subsidiaries, Universal required a certain level of working capital. To satisfy its working capital needs, Universal sought and obtained funding from outside investors, including Defendants. *Id.*

Defendant Warburg Pincus, LLC ("Warburg") is a global private equity firm located in New York. *Id.* at 2. Defendant Warburg Pincus Equity Fund IX ("Warburg Equity IX") is a private equity fund established and controlled by Warburg. *Id.* In early 2006, Warburg anticipated the potential for growth for managed care companies like UHC, particularly involving PFFS contracts. *Id.* at 4. At that time, Dr. Desai and UHC were in the process of forming UHCIC to participate in the relatively new PFFS market. *Id.* at 5. Warburg was working with individuals it perceived to have experience regarding managed care companies, including Defendant Allen Wise ("Wise"). *Id.* at 5. Wise had worked in the health care industry for many years, and Warburg had previously made a profitable investment in a company of which Wise was the CEO. *Id.*

On May 26, 2006, Warburg Equity IX, Wise, and Universal entered into a securities purchase agreement (the "Stock Purchase Agreement") whereby Warburg Equity IX and Wise agreed to purchase shares of Series A Convertible Preferred Stock (the "Preferred Stock") of Universal. *Id.* at 6. Warburg Equity IX agreed to pay Universal $29,000,000 for 11,143,871 shares of Preferred Stock, and Wise agreed to pay $1,000,000 for 384,271 shares of Preferred Stock. *Id.* at 6–7. About the same time, Warburg Equity IX and Universal entered into a loan and security agreement (the "Loan Agreement") whereby Warburg Equity IX agreed to loan up to $11,000,000 to

Universal until the purchase of the Preferred Stock was consummated. *Id.* at 7. In between May and August 2006, Warburg Equity IX loaned $6,200,000 to Universal pursuant to the Loan Agreement. *Id.* On August 17, 2006, the stockholders of Universal executed a stockholders' agreement (the "Stockholders Agreement") and Universal filed an Amended and Restated Certificate of Incorporation ("COI"). *Id.* at 8. The Stockholders' Agreement and the COI detailed the powers, rights, and preferences of Warburg Equity IX and Wise as holders of the Preferred Stock. *Id.* at 8–11. On August 18, 2006, Warburg Equity IX paid Universal $22,660,471, which along with the prior loan and accrued interest represented total paid in capital by Warburg Equity IX of $29,000,000, in return for 11,143,871 shares of Preferred Stock. *Id.* at 8. On or about the same date, Wise paid $1,000,000 to Universal in return for 384,271 shares of Preferred Stock. *Id.*

The Stockholders' Agreement provided Warburg Equity IX the right to have at least two of the seven members of the Universal Board of Directors ("the Board") appointed by Warburg Equity IX. *Id.* at 9. Joel Ackerman (a principal at Warburg) and Wise were initially appointed board members. *Id.* The Stockholders' Agreement required Board approval for various key actions, including, among other activities: selling, leasing or disposing of assets in excess of one million dollars; incurring indebtedness for borrowed money in excess of one million dollars; and capital expenditures in excess of two hundred fifty thousand dollars. *Id.* Additionally, under the COI, Warburg Equity IX and Wise, as the only holders of Preferred Stock, had a first claim to any equity value of Universal, a right to control whether others could

own Preferred Stock, a right to receive quarterly dividends, and an optional right to elect a redemption obligation for Universal to repurchase the Preferred Stock on or after August 17, 2011, subject to Delaware law and contingent upon Universal having sufficient capital reserves to fund the requested redemption. *Id.* at 10. The COI specified the formula for calculating the redemption price of the Preferred Stock.[2] *Id.* at 11.

In 2007, UHCIC reported to the Florida Office of Insurance Regulation ("FOIR") that it projected to write approximately $56 million in premiums nationwide, but actually wrote $35 million in January 2007 alone and in excess of $61 million in February 2007. *Id.* at 11. Although UHCIC had an explosive rate of sales with anticipated 2007 premiums in excess of $760 million, FOIR notified UHCIC that it needed $100 million in additional capital by February 16, 2007, to avoid being placed into receivership. *Id.* at 11–12. On February 14, 2007, Universal notified FOIR it was voluntarily suspending all new sales of its Medicare PFFS plans effective immediately. *Id.* at 12. According to Plaintiff, Warburg had private conversations with FOIR, not disclosed to Universal, regarding the statutory capital FOIR was demanding. *Id.* Separately, Dr. Desai was speaking with FOIR and convinced FOIR to reduce its demand for additional statutory capital to $11 million, instead of the $100 million. *Id.*

---

[2] According to Plaintiff, if Warburg Equity IX and Wise elected to redeem the Preferred Stock after August 17, 2011, the price for Universal to redeem the Preferred Stock would have exceeded fifty million dollars. Doc. 2-253 at 11. However, Plaintiff takes the position that this never would have happened because Universal would not have had the money to redeem the stock at that price and Delaware law prohibits the sale of stock that results in a company's insolvency.

In March 2007 Wise resigned from the Board, and two months later in May 2007, Ackerman resigned from the Board. *Id.* at 14. Plaintiff alleges that Dr. Desai accused Warburg of violating its fiduciary duties in resigning from the Board because it hampered Universal's ability to run the company. *Id.* Plaintiff alleges that in 2007, Warburg perceived significant problems with Universal and its operations. *Id.* at 15. As of September 2007, Warburg Equity IX internally valued its $29 million investment in Universal at $10 million. *Id.* at 16. By 2008 Warburg purportedly perceived Universal's performance to be highly unpredictable. *Id.* at 15. According to Plaintiff, in early 2008, Warburg advanced its goal to exit its investment in Universal, regardless of the impact on Universal. *Id.* at 14. Plaintiff alleges that by the end of 2008, Warburg's confidence in Universal's ability to raise capital was extremely low. *Id.* at 15. Warburg designated Tenno Tsai ("Tsai") as a representative on the Universal Board in 2007, and Tsai was replaced by Alok Sanghvi ("Sanghvi") in 2009. *Id.* at 15–16.

Plaintiff alleges that shifts in the regulatory environment in 2009, including passage of the Medicare Physician Payment Reform Act and later the Affordable Care Act, resulted in lower profit margins for companies in the health care industry affected by the new legislation. *Id.* at 17. In a March 2009 quarterly evaluation report prepared by Warburg, it reduced the internal value of its investment in Universal to seven million dollars. *Id.* Sanghvi was the primary person at Warburg who prepared the March 2009 valuation. *Id.* At the time, Sanghvi was also Warburg's representative on

the Universal Board. *Id.* At some point during 2009, after the first quarter valuation, Warburg further reduced its assessment of value of Warburg Equity IX's investment in Universal to $5 million. *Id.*

Although Universal's gross revenue increased from 2009 to 2010, profit margins decreased because medical claims grew in like amounts and reimbursement rates were reduced resulting in a decrease in profit margins from 17% to 11% during this period. *Id.* at 18. According to Plaintiff, despite Warburg's expertise in the healthcare space and its understanding of the impact of regulatory changes, it failed to disclose to anyone at Universal its assessment or internal reduced valuation. *Id.*

After his appointment to the Universal Board in January 2009, Sanghvi purportedly continued overtures to redeem Warburg Equity IX and Wise's Preferred Stock prior to the August 2011 redemption date. *Id.* Plaintiff alleges Universal did not have sufficient capital surplus to redeem the Preferred Stock despite Warburg's urging that redemption was inevitable and in Universal's best interest. *Id.* at 19. Ultimately, Dr. Desai decided to move forward with negotiating an early redemption and designated Sandip Patel ("Patel"), secretary and general counsel for Universal, as Universal's representative to negotiate with Warburg. *Id.* Universal sought a loan to provide sufficient funds to meet Warburg's redemption demands. *Id.* According to Plaintiff, prior to entering into debt financing, Universal's finance team determined that Universal would be unable to meet the debt covenants attendant to the debt financing based on their own projections. *Id.* at 20.

In October 2010, Patel advised Sanghvi that a consortium of banks led by Wells Fargo (the "Lending Group") was considering Universal's request for debt financing. *Id.* at 20. Between October 2010 and February 2011, Sanghvi, acting as principal of Warburg on the one hand and as director of Universal on the other, communicated with Patel and Wells Fargo concerning the redemption. *Id.* At Sanghvi's request, Patel provided him with confidential, detailed information concerning the Lending Group's proposal and financial information provided by Universal to Wells Fargo in support of Universal's financing request. *Id.* at 21. In December 2010, Patel advised Sanghvi that Universal received a commitment from the Lending Group for a $37.5 million loan, leaving Sanghvi and Patel to negotiate how much of the proceeds of the debt financing would be used to redeem Warburg Equity IX and Wise's preferred stock. *Id.* at 21–22.  In January 2011, the Universal Board voted to approve the debt financing. *Id.* at 22. At that time, the Universal Board consisted of Dr. Desai, Dr. Desai's wife (Seema Desai), Dr. Desai's nephew (Deepak Desai), and Warburg's designee (Sanghvi). *Id.* Sanghvi abstained from the Universal Board vote to approve the debt financing with Wells Fargo. *Id.* at 22–23.

On February 7, 2011, Universal, Warburg Equity IX, and Wise entered into a securities purchase agreement memorializing the Stock Redemption. *Id.* at 23. The Stock Redemption transaction closed in Florida on February 14, 2011, with Warburg Equity IX receiving $32,286,667 and Wise receiving $1,113,333, in satisfaction of the Stock Redemption. *Id.* On February 15, 2011, Sanghvi left Warburg for new

employment. *Id.* Warburg provided Sanghvi a substantial bonus after his departure. *Id.*

Just shy of two years after the Stock Redemption, Universal filed for Chapter 11 bankruptcy on February 6, 2013. *Id.* at 1. On April 22, 2013, Plaintiff Soneet Kapila was appointed as the Chapter 11 Trustee and is now the Liquidating Agent of Universal. In February 2015, Plaintiff initiated this adversary proceeding against Defendants Warburg Pincus, LLC; Warburg Pincus Private Equity Fund IX, L.P.; Allen Wise, and Alok Sanghvi seeking avoidance and recovery of alleged fraudulent transfers under Sections 544, 548, and 550 of the Bankruptcy Code and Chapter 726, Fla. Stat., and breach of fiduciary duties. Doc. 2-2. Plaintiff seeks to avoid Universal's $33,400,000 redemption of the Preferred Stock owned by Warburg Equity IX and Wise. *Id.* at 1–2.

In a twenty-count Second Amended Complaint filed in November 2018, Plaintiff sues Defendants Warburg, Warburg Equity IX, and Wise for: Avoidance of Fraudulent Transfer of Property against Warburg Equity IX under 11 U.S.C. § 548(a)(1) (Count I); Avoidance of Fraudulent Transfer of Property as to Warburg Equity IX under 11 U.S.C. § 548(a)(1)(B) (Count II); Avoidance of Fraudulent Transfer of Property as to Warburg Equity IX under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b) (Count III); Avoidance of Fraudulent Transfer of Property as to Warburg Equity IX under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b) (Count IV); Avoidance of Fraudulent Transfer of Property as to Warburg Equity IX under 11 U.S.C. § 544 and Fla. Stat. § 726.106(1) (Count V); Recovery of Avoided Transfer as

10

to Warburg Equity IX under 11 U.S.C. § 550 (Count VI); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 548(a)(1)(A) (Count VII); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 548(a)(1)(B) (Count VIII); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(a) (Count IX); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b) (Count X); Avoidance of Fraudulent Transfer of Property as to Wise under 11 U.S.C. § 544 and Fla. Stat. § 726.106(1) (Count XI); Recovery of Avoided Transfer as to Wise under 11 U.S.C. § 550 (Count XII); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 548(a)(1)(A) (Count XIII); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 548(a)(1)(B) (Count VXIV); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(a) (Count XV); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b) (Count XVI); Avoidance of Fraudulent Transfer of Property as to Warburg under 11 U.S.C. § 544 and Fla. Stat. § 726.106(1) (Count XVII) Breach of Fiduciary Duty as to Warburg-Agency (Count XVIII); Breach of Fiduciary Duty as to Warburg Equity IX as Controlling Shareholder (Count XIX); and Breach of Fiduciary Duty as to Warburg as Controlling Shareholder (Count XX). Doc. 2-253. Plaintiff alleges that the stock redemption was unfair to Universal and rendered Universal insolvent, saddled with debt financing, and left with unreasonably small capital. *Id.* at 24, ¶¶ 110–111.

Pretrial proceedings took place in the bankruptcy court, and on March 4, 2021, the parties filed a Joint Motion for Withdrawal of Reference of the adversary proceeding to the District Court for purposes of conducting a jury trial (Doc. 1-1), which was granted by the District Court on September 24, 2021 (Doc. 1-2).

Defendants contend that at the time of the Stock Redemption, Universal was solvent, and it was the decisions made by Universal's management long after Defendants' exit from the company that impacted Universal's solvency. Doc. 55 at 4. Defendants submit that Universal's financial decline and bankruptcy filed two years after the Stock Redemption were due to poor management, delayed CMS payments, and equity distributions that occurred after the redemption transaction. According to Defendants, they had no participation in Universal's business and operations after the redemption, and the claims by Plaintiff are brought in an effort to allegedly obtain an unwarranted windfall from Warburg.

Defendants filed *Daubert* motions challenging Plaintiff's experts, Dr. Peter Kongstvedt, Professor Stuart Cohn, and CPA Stanley Murphy, which the Court granted in part and denied in part. *See* Docs. 30, 31, 38, 75. Now before the Court are six motions filed by Plaintiff seeking to exclude Defendants' experts—L. Lamar Blount, Henry Fishkind, Samuel J. Hewitt, Ian Ratner, E. Norman Veasey, and Richard B. Gaudet— under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993), and Federal Rules of Evidence 702 and 403. *See* Docs. 41, 42, 43, 44, 45, and 47.

12

## II.   LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence

702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if:
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts
> of the case.

Fed. R. Evid. 702. Rule 702 is a codification of the United States Supreme Court's

decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In *Daubert*,

the Supreme Court described the gatekeeping function of the district court to "ensure

that any and all scientific testimony or evidence is not only relevant, but reliable." *Id.*

at 589; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*).

The Supreme Court extended its reasoning in *Daubert* to non-scientist experts in *Kumho*

*Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

In performing its gatekeeping function, the Court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he
> intends to address, (2) the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by the sort of inquiry
> mandated in *Daubert*, and (3) the testimony assists the trier of fact,
> through the application of scientific, technical, or specialized expertise,
> to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d

548, 562 (11th Cir. 1998)). Thus, the three discrete inquiries to determine the

admissibility of expert testimony are qualifications, relevance, and reliability. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1341 (11th Cir. 2003). Although there is some overlap among these inquiries, they are distinct concepts that the Court and litigants must not conflate. *Id.*

"The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004) (citation omitted). "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1113 (11th Cir. 2005). The admission of expert testimony is a matter within the discretion of the district court, which is afforded considerable leeway in making its determination. *Frazier*, 387 F.3d at 1258.

"The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786. The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999).

## III.    DISCUSSION

### A.    Cumulative Testimony

Several of Plaintiff's *Daubert* motions challenge Defendants' experts on the basis that the testimony and opinions being offered are cumulative. Specifically, Plaintiff argues that defense experts Dr. Fishkind, Ian Ratner, and E. Norman Veasey opine on the same issues that (1) the negotiations leading up to the redemption transaction were conducted at arm's-length and (2) Universal obtained economic benefits from the early redemption of the preferred shares of Wise and Warburg Equity IX. *See* Doc. 42 at 2; Doc. 44 at 2; Doc. 45 at 2. Plaintiff additionally argues the soundness and thoroughness opinion of Ian Ratner is cumulative of Richard Gaudet's opinions. Doc. 44 at 23–24. Defendants respond in opposition arguing that the opinions are not identical and, in any event, even if similar, they are being offered by the experts from differing perspectives and thus are not cumulative. Doc. 56 at 20; Doc. 57 at 10–11; Doc. 58 at 24.

Federal Rule of Evidence 403 allows a Court to exclude relevant evidence when the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. While the Court has no intention of allowing the jury to hear the same opinion three times, the Court is unable to say at this juncture if an expert's opinion is unnecessarily cumulative until the evidence and testimony are introduced at trial. "Expert testimony may be needlessly cumulative where there is 'substantial overlap' between the areas on which

15

two experts will testify." *Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, No. 10-21511-Civ, 2010 WL 4225947, at *2 (Oct. 21, 2020) (citation omitted). However, until the experts testify at trial, the Court is unable to determine whether the testimony is cumulative. Parties sometimes choose to call one expert versus another due to a variety of reasons, including availability of the experts. Moreover, testimony on the same topic by different experts is not necessarily cumulative where the experts will testify from different professional perspectives. *Id.* (citing *Mendez v. Unitrin Direct Prop. & Cas. Ins. Co.*, No. 8:06–cv–563–SCB–MAP, 2007 WL 2696795, at *1–*2 (M.D. Fla. Sept. 12, 2007) (allowing two experts to testify regarding bad faith issues where one was claims handling expert and other was expert on an insurer's legal duties to its insured); *Geico Cas. Co. v. Beauford*, No. 8:05–cv–697–SCB–EAJ, 2007 WL 2412974, at *5 (M.D. Fla. Aug. 21, 2007) (allowing two experts to testify regarding bad faith issues where one was attorney and other was experienced claims adjuster)). Where an expert meets the *Daubert* criteria of being qualified, reliable, and helpful to the jury, excluding the opinion as cumulative at this stage is premature. Accordingly, as to the argument that the defense experts' opinions are cumulative, Plaintiff's motions are due to be denied without prejudice to Plaintiff objecting at trial, if warranted.

### B.    L. Lamar Blount

Plaintiff first moves to exclude the opinions and testimony of defense CPA expert, L. Lamar Blount, on the basis that his opinions are irrelevant, his methodology unreliable, and his testimony unhelpful to the jury. Doc. 41. Defendants respond that Plaintiff's motion seeks to deprive the jury of material evidence regarding Universal's

16

financial condition post-redemption which is relevant to the issues in this case including Universal's solvency.

In December 2012, the Florida Office of Insurance Regulation ("FOIR"), through its consultant Kirsha Consulting ("Kirsha"), conducted a financial exam of Universal's subsidiaries, UHC and UHCIC. In sum, Mr. Blount opines that the FOIR's examination incorrectly determined that UHC and UHCIC overstated their Centers for Medicare & Medicaid Services ("CMA") risk adjusted receivable (MRA Receivable) and that the MRA Receivable was an element relied on by the FOIR in determining to recommend UHC and UHCIC be placed into receivership. FOIR relied on Kirsha's estimates to determine that UHC and UHCIC were either impaired or insolvent at 2012 year-end. The inaccurate estimate understated receivables by millions which were ultimately received in 2015 and 2016. Defendants argue that Mr. Blount's opinions regarding the understated MRA Receivable projection are relevant and serve to undermine the Plaintiff's solvency arguments.

1.    Qualifications

The first question under *Daubert* is whether the proposed expert witness is qualified to testify competently regarding the matters he or she intends to address. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998). Mr. Blount is a CPA with over thirty-five years' experience providing financial statement audits, financial advisory services, reimbursement consulting, and litigation services. He has provided consulting services to over 500 healthcare clients. He is certified in Financial Forensics and is the president and founder of Health Law Network and American

17

benefit Advisors, which is a consulting and advisory firm providing expert services on Medicare and Medicaid compliance, healthcare billing, medical claim submission and reimbursement, among other issues in the healthcare insurance industry. Mr. Blount has testified as an expert in more than 400 matters in more than 40 states. Plaintiff's motion does not challenge his qualifications, and the Court finds that Mr. Blount is qualified to testify to the opinions he offers in this case.

    2.   <u>Methodology</u>

The second prong of the *Daubert* analysis considers whether Blount's methodology is reliable. "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Frazier*, 387 F.3d at 1262 (citing Fed. R. Evid. 702, Advisory Committee Notes (2000)). There are four non-exhaustive factors district courts consider in evaluating reliability:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

*Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). A district court can take other relevant factors into account as well. *Id.* (citations omitted).

"If the [expert] witness is relying solely or primarily on experience, then," in establishing reliability, as is the case here, "the witness must explain how that

experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (citation and internal quotation marks omitted). The Court's analysis as to reliability "focus[es] 'solely on principles and methodology, not on the conclusions that they generate.'" *Seamon*, 813 F.3d at 988 (citation omitted). Given Mr. Blount's extensive career providing accounting and consulting services for healthcare clients, including insurance companies, his experience is relevant and reliably applied to the facts of this case.

Plaintiff's primary criticism of Mr. Blount's opinions is that they focus on the CMS reconciliation payments in 2015 and 2016, which Plaintiff argues are irrelevant to the financial analysis of Universal's solvency at the time of the Stock Redemption in February 2011. Because the payments were received over four years after the redemption and over two years after the bankruptcy was filed, Plaintiff contends the payments are irrelevant to the issues in this case and will only serve to confuse the jury. Because the payments and Blount's testimony discussing same are irrelevant, Plaintiff argues such opinions are therefore unhelpful to the jury.

Defendants respond that the information is directly relevant to Universal's solvency, the status and timing of which are material issues in the case. Defendants further contend that the MRA Receivables are probative of Universal's successful operating and financial condition after the date of the redemption. As Defendants' response explains, the financial condition of the transferor and transferee before and after the transfer are factors to be considered in cases of alleged fraudulent transfer.

Whether Universal accurately stated its expected receivables bears directly on issues of cash flow, solvency, capital reserves, and the ability to pay debt. Plaintiff here argues that the Stock Redemption in February 2011 rendered Universal insolvent, saddled with debt financing, and left with unreasonably small capital. Doc. 2-253 at 24, ¶¶ 110–111. Mr. Blount's opinions counter that, pointing to Universal's financial stability following the redemption as evidence that the redemption did not cause Universal's financial decline.

Plaintiff criticizes Mr. Blount's opinions for his failure to consider other factors, such as the performance of UHCIC or the many other reasons cited by the FOIR as grounds for placing UCH and UHCIC into receivership. Defendants respond that Mr. Blount's opinions were confined to the MRA Receivables. The fact he did not render opinions related to other matters does not render inadmissible his opinion related to the impact of the MRA Receivables. To the extent Plaintiff questions the completeness of Mr. Blount's analysis, such inquiry may be pursued on cross examination.

3.   Helpfulness to the Jury

To satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (11th Cir. 2004). Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147

(1997). Given Mr. Blount's credentials and the financially-detailed nature of the subject matter, Mr. Blount's testimony will be helpful to the jury. The motion to exclude the testimony and opinions of Lamar Blount is therefore due to be denied.

### C.   Henry H. Fishkind, Ph.D.

Plaintiff next moves to exclude the opinions and testimony of defense expert, Henry Fishkind, Ph.D. (Doc. 41) on the basis that Dr. Fishkind is unqualified, his opinions are unreliable, and his testimony would be cumulative of both Norman Veasey and Ian Ratner. Defendants respond in opposition (Doc. 56) arguing that Dr. Fishkind is qualified to offer the opinions as to how Universal's early redemption of Warburg's stock produced economic benefits to Universal and how the redemption was an arms-length negotiation. Additionally, the defense offers the opinions of Dr. Fishkind to rebut the opinions of Professor Cohn. Defendants also argue the opinions would be beneficial to the jury.

In his report, Dr. Fishkind offers two opinions. Doc. 42 at 27–64. First, he explains how Universal's early redemption of Warburg's stock produced economic benefits to Universal. Second he opines that from an economics perspective the Warburg stock redemption was an arms-length transaction. Plaintiff moves to exclude Dr. Fishkind's testimony and opinions primarily due to his lack of relevant experience

and qualifications and also because his testimony is unreliable, unhelpful for the jury, and is otherwise cumulative of other defense experts' opinions.[3]

1.     Qualifications

Plaintiff challenges Dr. Fishkind's qualifications arguing his academic and professional background in economics does not qualify him to render opinions in this case in which a stockholder with contractual control rights[4] and who holds a seat on the company's board of directors seeks to redeem preferred stock. Defendants contend Plaintiff defines the issues too narrowly.

Because Dr. Fishkind has never previously served as an expert regarding a preferred stock redemption, Plaintiff argues Dr. Fishkind's court experiences do not translate to the issues in this case. While Plaintiff acknowledges Dr. Fishkind's extensive authorship and research, Plaintiff nevertheless argues that Dr. Fishkind's expertise as an economist does not include issues related to arms-length transactions or fiduciary duties owed by board members.  In response, Defendants submit that Dr. Fishkind's expertise as an economist and his experience in economic analysis and forecasting qualify him to render opinions in this case.

Dr. Fishkind holds a Ph.D. in economics, and his professional experience includes over thirty years in economic analysis. He was an associate professor in the

---

[3] According to the motion, Dr. Fishkind offers a third opinion, that is not in dispute, namely that Delaware law prohibits a redemption where the redeeming corporation would be rendered insolvent. Doc. 42 at 5 n.6 (citing 8 Del. Code § 160(a)(1)).

[4] The parties dispute whether Warburg was a "controlling shareholder" under applicable Delaware law. As this Court previously observed, such determination is a fact-intensive inquiry. *See* Doc. 75 at 27–28.

University of Florida's Department of Economics, a member of Governor Bush's Council of Economic Advisors, and has founded and served on the board of directors of two publicly-traded companies, as well as on an audit committee of one of the publicly-traded companies. He has served as an expert in more than fifty federal and state court matters, including on behalf of state and municipal governments, the U.S. Department of Justice, and Fortune 500 companies.

As courts in this Circuit have noted, "[t]he qualification standard for expert testimony is 'not stringent' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted); *see also Hewitt v. Liberty Mut. Grp., Inc.*, 268 F.R.D. 681, 686 (M.D. Fla. 2010). Regarding Dr. Fishkind's qualifications, the Court finds that given Dr. Fishkind's experience professionally and in academia, he is at least minimally qualified to opine on the issues of the economic impact on Universal following an early redemption of preferred stock and as to the arms-length nature of the redemption transaction.

2.     <u>Methodology and Helpfulness to the Jury</u>

Plaintiff challenges Dr. Fishkind's methodology as unreliable.

*a. Opinion that Universal Received Substantial Benefit from Redemption*

As to the first opinion that redemption of the Warburg stock provided economic benefit to Universal, Plaintiff contends the claimed benefits are illusory. Dr. Fishkind relied on the facts that the redemption price was $19.4 million less than would have

been paid under the Stockholders' Agreement, redemption avoided Universal having to pay an annual dividend, relieved Universal of negative covenants, and made available $2.5 million in operating capital from the monies remaining on the Wells Fargo loan.

As to the $19.4 million in savings, Plaintiff contends there was no actual savings because Universal would have never been able to pay the contractual redemption price of $52 million in the first instance because Universal had to borrow the $32 million in order to fund the early redemption. Next, Plaintiff argues that while unpaid dividends may accumulate, there is no guarantee that such dividends would ultimately be paid as Warburg would have received no payment for the redemption of its preferred shares or past cumulative dividends if Universal was insolvent after paying its creditors. Finally, Plaintiff argues that replacing unsecured equity interests with covenant-heavy secured debt and credit lines with an "ugly"[5] amortization schedule cannot be considered an economic benefit to Universal. In making these arguments, Plaintiff acknowledges that the presiding Bankruptcy Judge ruled that the issue of whether reasonably equivalent value was received by Universal is a question of fact to be decided at trial. *See* Doc. 42 at 8 n.10 (citing Doc. 2-490, Order on Plaintiff's Motions for Partial Summary Judgment).

---

[5] The statement about an "ugly" amortization schedule comes from a December 2010 email from Warburg employee, Robert Buonanno, to Sanghvi in response to Sanghvi providing for Buonanno's review a term sheet from Wachovia to Universal related to the Wells Fargo Loan. Doc. 31-4 at 2.

In response to the motion to exclude Dr. Fishkind on this issue, Defendants argue that redemption of shares may constitute value to a corporation, and Dr. Fishkind's opinions concerning the economic and noneconomic benefits of the redemption to Universal is reliable. Dr. Fishkind opined that the early redemption provided an economic benefit in the form of an approximate 38% savings from the contractual redemption amount for the Warburg preferred stock, as well as providing $2.5 million in a revolving line of credit from the Wells Fargo loan. Dr. Fishkind opined that redeeming Wise's shares for $1.1 million generated savings of $0.7 million. Additionally, he explained the early redemption avoided a 12% annual dividend (an effective 16% rate due to compounding). Finally, he opined as to the non-economic benefit that Universal was no longer subject to common and typical restrictive covenants within the contracts underlying Warburg's investment.  Doc. 42 at 32–41. Dr. Fishkind's report includes calculations regarding the stock value adjusted for accrued dividends and savings from the redemption during the time the Wells Fargo loan was outstanding. *Id.* at 36–39, 41.

Plaintiff does not appear to challenge Dr. Fishkind's calculations or methods of computing these figures. Rather, relying on Delaware law that prohibits a redemption where the redeeming corporation would be rendered insolvent, Plaintiff attacks Dr. Fishkind's failure to consider whether Warburg would have been precluded from redeeming some or all of their shares at a point later in time due to Universal's financial condition. These arguments and the others raised by Plaintiff that the benefits are illusory is fodder for cross examination. Plaintiff may appropriately question Dr.

Fishkind regarding facts he relied upon and assumptions he made or failed to consider through cross examination, but such disputes are not a basis to exclude his opinions regarding the benefits of early redemption—to the extent such opinions are not cumulative at trial of other defense experts.

*b. Opinion that the Redemption was a Result of Arms-Length Negotiations*

Plaintiff argues that Dr. Fishkind's opinion that the redemption was the result of arms-length negotiations must be excluded as unreliable. In support, Plaintiff claims that Dr. Fishkind cites only to Sanghvi's self-serving actions of recusing himself from the Universal Board when it was time to vote for the Wells Fargo loan and the parties' purported experience and knowledge of the facts and issues surrounding the redemption as a basis for his conclusions. Plaintiff argues that Dr. Fishkind fails to address how the control provisions in the Stockholders' Agreement, namely that Warburg had to approve any loan of more than $1 million and had to approve Universal's repurchase or redemption of stock, factor in and bear on his opinion that the redemption transaction was conducted at arms-length. Plaintiff also challenges Dr. Fishkind's conclusion as to the parties' knowledge where Warburg failed to disclose its internal $5 million valuation to the other Universal board members. According to Plaintiff, Dr Fishkind inconsistently defines an arms-length transaction as applied to the facts in this case and could not explain Sanghvi's continued role as a Universal board member up until the redemption and given his purposeful failure to disclose the $5 million internal valuation.

In response, Defendants argue Dr. Fishkind opines that the economic realities and considerations of the redemption support the conclusion that, from an economics perspective, it was conducted at arm's length. Doc. 56 at 20. Relying on his background in economics, Dr. Fishkind reaches his opinion based on the following facts: (i) that Sanghvi represented Warburg IX's interests and Sandip Patel represented Universal's interests, and thus were "unrelated;" (ii) both "were experienced and knowledgeable about the facts and issues surrounding the transaction;" (iii) that "it was in the interest of both parties to negotiate a mutually acceptable and beneficial transaction redeeming the preferred stock at a discount to the Redemption Price;" and (iv) "the ultimate price of the redemption is consistent with the standard definition of a fair market value determined by the . . . parties acting as a willing seller and a willing buyer, each pursuing their own best interests, fully advised, and neither under duress." Doc. 42 at 42–44. Defendants argue that Stockholder Agreement provisions negotiated in 2006 cannot render an arms-length negotiation in 2011 impossible. Further, Defendants dispute Plaintiff's attempt to characterize the $5 million valuation as anything more than a placeholder which Defendants argue both Sanghvi and Weatherman[6] consistently testified. Weatherman called it an estimate based on a

---

[6] Elizabeth Weatherman was a Warburg Managing Director and was Sanghvi's supervisor. Doc. 42 at 20. Weatherman testified as to Warburg's standard evaluation process, which Plaintiff described as extensive and highly professional. Weatherman testified, "We spend a lot of time thinking about all kinds of factors, when we . . . are dealing with a private company, to do … a really good faith estimate of what we think it's worth as of the end of each quarter of each year. And there are a multitude of factors that go into this analysis …." Doc. 42 at 20–21 (quoting Weatherman deposition). Plaintiff argues this is in stark contrast to Sanghvi's testimony that the $5 million valuation was only a guess.

multitude of factors. Sanghvi called it a guess. Defendants submit this testimony is not contradictory. Further, Defendants submit that an equity valuation is an accounting, rather than an economic, concept and thus is immaterial to the fair market value of a corporation's shares. Doc. 56. Defendants contend that Plaintiff's challenges go to the weight of Dr. Fishkind's opinions, not their admissibility. The Court agrees. Plaintiff's motion on this issue is due to be denied. Given the complex and technical nature of the issues in this case, the Court concludes Dr. Fishkind's testimony from an economics perspective will assist the jury.

### D.   Samuel J. Hewitt

Plaintiff seeks to exclude the opinions and testimony of Defendants' CPA expert Samuel J. Hewitt because Mr. Hewitt has no opinions of his own; rather, his sole purpose is to rebut the opinions of Plaintiff's expert, Dr. Peter Kongstvedt. Doc. 43. Mr. Hewitt admittedly does not challenge Dr. Kongstvedt's qualifications. The entirety of Mr. Hewitt's report is to critique Dr. Kongstvedt's opinions. Because Mr. Hewitt offers no independent opinions, Plaintiff argues Mr. Hewitt's testimony should be excluded because he improperly testifies as to the credibility of Dr. Kongstvedt, which invades the province of the jury. Further, Plaintiff contends that any opinion by Mr. Hewitt attacking the reliability of Dr. Kongstvedt's opinions serves to invade the Court's gatekeeping function under *Daubert*.

Defendants respond (Doc. 54) that Mr. Hewitt is a licensed CPA with more than 38 years of experience in forensic, public, and general accounting. Mr. Hewitt was retained as a rebuttal expert and his opinions identify the flaws in Dr. Kongstvedt's

28

conclusions and opinions. Defendants argue that Mr. Hewitt's rebuttal testimony is proper and expressly contemplated by Rule 26.

Mr. Hewitt was retained by Defendants to review and comment on the expert report of Dr. Kongstvedt. Doc. 43 at 95. The opinions he offers are based on his review of the documents provided in the case and his education, experience, and training. A summary of Mr. Hewitt's opinions are as follows:

a) Kongstvedt's opinion that the Wells Fargo Loan put Universal at an unreasonable risk of default is unsupported;

b) Despite Kongstvedt's representation that he is a healthcare expert, his report contains numerous errors concerning healthcare regulatory requirements, the nature of financial capital, and healthcare corporate structures;

c) The Kongstvedt Report errs regarding statutory capital and risk-based capital requirements and overstates minimum statutory surplus requirements;

d) Kongstvedt understates the ability of Universal to move funds from the regulated subsidiaries to the parent company as service debt due to omissions and errors in his analysis;

e) Kongstvedt criticizes Universal's aggressive growth efforts, yet simultaneously criticizes FOIR's covenants which would serve to monitor and control growth;

f) Kongstvedt fails to acknowledge that Universal paid the Wells Fargo Loan interest and principal on a timely basis;

g) Kongstvedt fails to consider the advantages to Universal of the discounted preferred stock redemption in February 2011;

h) Kongstvedt fails to consider the risk assessment and underwriting procedures by Wells Fargo; and

i) Kongstvedt's opinions expect Warburg and Wise to have had an unrealistic level of foreknowledge regarding financial projections and future market conditions.

Doc. 43 at 95–97.

1. Qualifications

Mr. Hewitt is a licensed Certified Public Accountant with more than 35 years of experience in forensic accounting, due diligence, bankruptcy consulting,

information technology, and corporate accounting. He has a degree from the University of North Carolina in business administration with a concentration in accounting. He has testified as an expert in state and federal courts, as well as in arbitrations, in complex commercial, bankruptcy, and class action litigation matters. Doc. 43 at 135–37. Plaintiff's motion does not challenge the qualifications of Mr. Hewitt.

   2.  <u>Methodology and Helpfulness to the Jury</u>

   Plaintiff argues that Mr. Hewitt's opinions are unreliable and improper comment on Dr. Kongstvedt's credibility. Plaintiff submits that because Mr. Hewitt offers no affirmative rebuttal opinions, and instead only disagrees with Dr. Kongstvedt's opinions, that such analysis is devoid of any methodology, is unhelpful to the jury, and invades the roles of the Court and the jury. Plaintiff argues that Mr. Hewitt's attack on Dr. Kongstvedt's credibility is inadmissible under Federal Rules of Evidence 402, 403, and 608.

   In response, Defendants argue that rebuttal testimony is expressly contemplated under the Federal Rules of Civil Procedure. Indeed, Rule 26 provides, in relevant part regarding expert disclosures, that "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party. . ., [such disclosure shall be made] within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D)(ii). Defendants additionally argue that Plaintiff's characterization of Mr. Hewitt's opinions as an improper attack on Dr. Kongstvedt's credibility is factually inaccurate. Review of Mr. Hewitt's opinions reveals that they are a challenge

to Dr. Kongstvedt's opinions and methodologies, not an attack on his character or truthfulness.

Courts in this District have permitted expert rebuttal testimony even when the expert does not offer his own independent opinions. *See Fed. Trade Comm'n v. Roca Labs, Inc.*, No. 8:15-CV-2231-MSS-CPT, 2018 WL 7917612, at *5 (M.D. Fla. Mar. 27, 2018) ("An expert may properly challenge another expert's testimony, even if he does not offer a competing opinion regarding the central issue.") (citing *Wiand v. Waxenburg* 611 F. Supp. 2d 1299, 1315 (M.D. Fla. 2009)). As articulated by the Eighth Circuit, "[t]he function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." *United States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir. 2005) (citation omitted). It follows that rebuttal evidence may appropriately be used to challenge the evidence or theory of an opponent, but not to establish a case-in-chief. *See Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir.1991) ("Rebuttal must be kept in perspective; it is not to be used as a continuation of the case-in-chief."); *see also* John Henry Wigmore, EVIDENCE IN TRIALS AT COMMON LAW § 1873 (1976) (a district court should allow rebuttal evidence only if it is necessary to refute the opponent's case). The opinions of Mr. Hewitt offered here serve to rebut the opinions of Plaintiff's expert, which the Federal Rules allow. Thus, Mr. Hewitt's testimony would be helpful to the jury as the issues concerning healthcare regulatory requirements, the nature of financial capital, healthcare corporate structures, and statutory surplus requirements are likely beyond the common juror's understanding.

31

The motion to exclude the rebuttal opinions and testimony of Sam Hewitt is due to be denied.

### E.    Ian Ratner

Plaintiff seeks to exclude certain opinions of defense expert Ian Ratner. Doc. 44. First, Plaintiff requests that any duplicate opinions related to the negotiations being an arms-length transaction and that Universal received economic benefits from the early redemption of preferred shares be excluded as cumulative of Dr. Fishkind's opinions. Next, Plaintiff seeks to exclude Mr. Ratner's opinions regarding the Marshall & Stevens valuation as being improper comment on another witness's credibility. As for Mr. Ratner's opinions regarding CMS payments, Plaintiff argues such opinions are irrelevant or alternatively their probative value is outweighed by the danger of unfair prejudice and confusion of the jury. Finally, Plaintiff seeks to exclude Mr. Ratner's opinions as to the soundness and thoroughness of Wells Fargo's underwriting as being cumulative of Gaudet's opinions. As discussed above, the request to exclude expert testimony as cumulative is denied without prejudice.

Defendants respond (Doc. 57) that Mr. Ratner is a CPA with over thirty years' experience in accounting and business valuation services who has vast experience in conducting due diligence. Defendants argue that Plaintiff's challenges to Mr. Ratner's opinions are actually an attempt to exclude from the evidentiary record relevant facts that refute Plaintiff's claims and theories such as: (1) an independent post-redemption valuation of Universal's common stock and equity in an amount greater than $91 million as of August 2011; (2) $56 million in government reimbursements for

receivables booked at year end in 2012; and (3) Universal's underwriting in connection with the Wells Fargo Loan by four national, independent lenders, all of whom determined Universal was creditworthy and capable of repaying the 2011 $37.5 million loan.

Mr. Ratner's opinions are summarized as follows:

a) As of February 14, 2011, just before the Stock Redemption, Universal was solvent, with total invested capital exceeding stated interest-bearing liabilities by $170.8 million;
b) Following the 2011 Stock Redemption, Universal remained solvent, with total invested capital exceeding stated interest-bearing liabilities by $137.4 million;
c) The Stock Redemption was reasonable from both Universal and Warburg Equity IX and Wise's points of view;
d) The 2011 lending group's underwriting process and due diligence investigation before approving the $37.5 million loan to Universal was sound and thorough;
e) Universal management pursued aggressive growth after the 2011 Stock Redemption;
f) Universal's bankruptcy filed in February 2013 resulted from Florida regulator's actions to institute receivership proceedings against UHC and UHCIC, the April 2012 loan covenant defaults claimed by BankUnited, and BankUnited's expressed intent to call its loan;
g) Plaintiff's expert Stanley Murphy's opinion that Universal was insolvent as of February 2011 is invalid;
h) Universal's redemption of preferred stock held by Wise for $1.1 million was reasonable and would have no bearing, based on the size of the redemption, on Universal's solvency; and
i) Murphy's damage opinions are flawed.

Doc. 44 at 30–33.

1. Qualifications

Plaintiff argues that nothing in Mr. Ratner's CV or his testimony indicates that he is qualified to offer the opinions stated. Review of Mr. Ratner's CV and report reveals he is a Certified Public Accountant licensed in Georgia and is accredited in

Business Valuations from the American Institute of Certified Public Accountants. He is a certified fraud examiner. He has graduate and undergraduate degrees from McGill University in Montreal, Canada. He co-authored a textbook titled "Business Valuation and Bankruptcy." Over the last 25 years, Mr. Ratner has been designated as an expert witness in complex commercial litigation cases, damages and lost profit cases, valuation disputes, and bankruptcy litigation involving solvency disputes.  Doc. 44 at 34; Doc. 57-1 at 215–16. Mr. Ratner also has substantial experience in the area of due diligence. He was regularly retained by lenders and private equity groups to perform pre-loan and pre-investment due diligence. Doc. 57 at 7. Mr. Ratner's qualifications are relevant, and he is at least minimally qualified to testify on the opinions proffered.

    2.  <u>Methodology and Helpfulness to the Jury</u>

        *a)  Marshall & Stevens Valuation*

Plaintiff seeks to preclude Mr. Ratner from testifying regarding the Marshall & Stevens valuation as an improper comment on the credibility of any Marshall & Stevens witness that testifies. Doc. 44 at 9–10. According to Defendants, in June 2011 Universal engaged Marshall & Stevens, Inc., to value Universal's common stock as of August 15, 2011, six months after the Stock Redemption, for purposes of a proposed executive stock compensation offering. Doc. 57 at 17–18. On June 20, 2012, Marshall & Stevens issued an appraisal of the common stock and options for Universal as of August 15, 2011. Doc. 57-4. Among other findings, the report concluded the fair market value of Universal's total equity was a little over $91 million. *Id.* at 41. Universal's outside auditors, Ernst & Young LLP, reviewed and approved the

Marshall & Stevens valuation. Doc. 57-5. On November 29, 2012, Marshall & Stevens issued an appraisal of the common stock as of September 1, 2012, which indicated Universal's total equity was approximately $97 million. Doc. 57-6 at 40.

Without much explanation or argument, Plaintiff submits that Mr. Ratner's testimony regarding the Marshall & Stevens' valuation should be excluded because Ratner repeatedly defends the valuation analyses in order to support his own valuation testimony. Plaintiff argues that to allow such testimony would be violative of Fed. R. Evid. 608(a) which precludes a witness from vouching for another witness's credibility. In response, Defendants argue that Ratner performed his own independent valuation of Universal's assets and solvency. The Marshall & Stevens valuation corroborates his conclusions. Significantly, the Marshall & Stevens valuation demonstrates Universal had positive equity greater than $91 million in August 2011 and greater than $97 million in September 2012, thereby undermining Plaintiff's insolvency theory. Defendants argue that Mr. Ratner should not be precluded from discussing such relevant facts, which he considered in rendering his opinions and which are relevant and admissible. The Court disagrees with Plaintiff's characterization that the challenged testimony is a comment on the credibility of the Marshall & Stevens' employees who prepared the report. Plaintiff has not raised a meritorious argument for excluding Ratner's testimony regarding the Marshall & Stevens valuations and the motion is due to be denied on this issue.

b. *Economic Value Received from Early Redemption*

Plaintiff argues that Ratner may not testify that Universal received economic value from the early redemption of the preferred stock because a corporation that redeems its own shares receives nothing of value as a matter of law, and thus the testimony is irrelevant. Doc. 44 at 10–11 (citing *Robinson v. Wangermann*, 75 F.2d 756, 757 (5th Cir. 1935)). Defendants respond that the facts of *Wangermann* are inapposite to the situation here in which the shareholder receives cash for its stock and provided the company is solvent. The issue of Universal's solvency at the time of the redemption is in dispute. Plaintiff's challenge to Ratner's opinion is relevancy. Given the competing expert opinions on the issue, including the dispute as to the status of Universal's solvency, the testimony appears to be relevant. Plaintiff may renew its relevancy objection at trial, if warranted, and appropriately challenge Ratner's opinions through cross examination.

c. *2015 and 2016 Payments from CMS*

In 2015 and 2016, the Centers for Medicare & Medicaid Service ("CMS") paid more than $56 million to UHC and UHCIC on account of risk adjusted premium receivables (MRA Receivables) booked at the end of 2012. Plaintiff submits Ratner's opinions regarding the MRA Receivables are irrelevant because they do not make any fact of consequence in determining this action more or less probable. Specifically, Plaintiff argues the MRA Receivables were received more than four and one-half years after the preferred stock redemption that occurred in February 2011 and more than two and one-half years after Universal filed for bankruptcy in February 2013. And

even if relevant, Plaintiff argues that the probative value of the CMS payments would be outweighed by the danger of unfair prejudice and confusion of the jury.[7]

In response, Defendants argue the CMS payments are relevant because pre- and post-transfer net profits and losses, cash flow, availability of credit, projections, and business plans are all relevant to the Court's inquiry as to the financial condition of a debtor and the alleged fraudulent nature of any transfers. Defendants submit that evidence of receivables booked after the redemption but before the filing of bankruptcy calls into questions whether Universal reasonably stated its receivables, which would impact cash flow and directly bear on the issues of Universal's solvency, capital, and ability to pay debts. Doc. 57 at 21–22. Defendants' response demonstrates the relevancy of the testimony and the motion to exclude these opinions is due to be denied.

> ### d. *Soundness and Thoroughness of Wells Fargo's Underwriting and Due Diligence*

Plaintiff moves to exclude the testimony and opinions of Ratner regarding the soundness and thoroughness of the underwriting and due diligence by Wells Fargo and the consortium of banks for the loan that closed on February 4, 2011, as being cumulative and irrelevant. Additionally, Plaintiff contends Ratner is unqualified to offer the opinion.

---

[7] Plaintiff also challenges these opinions as being duplicative of Blount's anticipated testimony. As previously stated, cumulative objections may be raised at the time the witnesses testify at trial.

Regarding Ratner's qualifications, Plaintiff argues that nothing in his CV or deposition testimony reflects he has experience in loan underwriting. Defendants respond that Ratner has over 25 years of experience conducting due diligence and transaction support projects, including more than 150 due diligence projects with values between $10 million and $200 million.  Defendants submit that Ratner has not only practical, but also theoretical experience. Recognizing that satisfying the qualification standard for expert testimony is "not stringent," *see Vision I Homeowners Ass'n, Inc.*, 674 F. Supp. 2d at 1325, the Court finds that Mr. Ratner meets that standard and will not disqualify him based on a lack of qualifications. As for Plaintiff's relevancy challenge, that too is without merit. Wells Fargo's evaluation of Universal's solvency and ability to re-pay the loan conducted as part of its analysis in determining whether to approve the loan is relevant to the issues in this case. Finally, Plaintiff's cumulative challenge is also denied, without prejudice to Plaintiff's right to raise the argument at trial. The motion to exclude Ratner is due to be denied.

## F.    E. Norman Veasey

Plaintiff seeks to exclude the testimony and opinions of E. Norman Veasey on the basis that he offers primarily impermissible legal conclusions. Doc. 45. As for his one fact-based opinion that the negotiations leading up to the stock redemption were conducted at arms-length, Plaintiff argues that such opinion is unreliable and has already been provided by defense experts, Dr. Fishkind and Ian Ratner, and thus it is cumulative. Defendants respond (Doc. 58) that Chief Justice Veasey is a preeminent

authority on Delaware law and is offered to rebut the opinions of Plaintiff's expert

Professor Stuart Cohn.

In his report, Mr. Veasey offers the following opinions:

(a) Warburg Equity IX was not a controller of Universal, nor was Warburg Pincus, LLC;

(b) Sanghvi's status as a Universal director, standing alone, is insufficient under Delaware law to establish that he had violated any fiduciary duties to Universal in connection with the redemption;

(c) because Warburg was not a "controller" of Universal, the entire fairness standard of review is inapplicable to the redemption;[8]

(d) even if the entire fairness standard of review applied, the conduct of Sanghvi and Warburg would meet that standard under Delaware law;

(e) the negotiation of the redemption of Universal stock between Sandip Patel (General Counsel and Chief Administrative Officer of Universal) on behalf of Universal and Sanghvi on behalf of Warburg was conducted at arms-length;

(f) the fact that Sanghvi did not disclose in 2011 to the other Universal board members the 2009 internal estimate of value of the preferred stock did not violate any duty owed to Universal as a matter of Delaware law;

(g) requiring routine, internal estimates of the value of portfolio investments in a private equity company to be disclosed in negotiations would be contrary to Delaware law;

(h) Sanghvi did not violate his duty of loyalty to Universal and its stockholders under Delaware law; and

(i) because there was no violation or wrongdoing by Sanghvi, there can be no respondeat superior or aiding and abetting liability to impute to Warburg.

Doc. 45 at 35–37.

---

[8] "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013) (quoting *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)). "Entire fairness, Delaware's most onerous standard, applies when the board [of directors] labors under actual conflicts of interest." *In re Trados Inc. S'holder Litig.*, 73 A.3d at 44.

1. <u>Qualifications</u>

For the most part, Plaintiff does not challenge the qualifications of Veasey. Doc. 45 at 9, 15. Norman Veasey served on the Delaware Supreme Court from 1992 to 2004. He sat on approximately 3,500 panels addressing matters of Delaware law, including those at issue in this action. After retiring from the Delaware Supreme Court, Veasey became a senior partner at a law firm and thereafter special counsel for a Delaware law firm serving as an arbitrator, mediator, special master, as well as providing legal services in the areas of corporate, contract, and commercial transactions and litigation. Doc. 45 at 76. He served as the Chair of the American Bar Association's Section of Business Law Committee on Corporate Laws and has written extensively about the application of Delaware corporate law. *Id.* at 76–110. Plaintiff does not dispute Mr. Veasey's qualifications as an experienced jurist but contends that is precisely why his opinions are not admissible. Because all of Mr. Veasey's opinions are legal conclusions, except one, Plaintiff submits they must be excluded.

Plaintiff is correct that an expert "may not testify as to his opinion regarding ultimate legal conclusions." *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009); *see also* Fed. R. Evid. 704(a). As explained by the Eleventh Circuit, "courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) (quoting *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977)). It is the role of this Court to charge the jury as to the law, and therefore any statements of

Delaware law and/or legal conclusions offered by Mr. Veasey are appropriately excluded. That said, Plaintiff has offered Professor Cohn to opine on matters of corporate governance. Like Professor Cohn, Veasey may opine as to relevant factors in the testimony and evidence that are to be considered on the issues of control and regarding corporate governance, but he may not offer legal opinions instructing the jury on the law.

Considering Mr. Veasey's opinions as set forth in his report (Doc. 45 at 34–75), the Court agrees that many of Mr. Veasey's opinions overstep the boundary of a testifying expert because they constitute inadmissible legal opinions. Specifically, the following legal conclusions that Mr. Veasey opines as a matter of Delaware law are impermissible legal opinions: that Warburg was not a controller of Universal; that Sanghvi did not violate fiduciary duties; that the entire fairness standard of review does not apply; that the business judgment rule applies; that even if applicable, Warburg and Sanghvi met the entire fairness standard; that Sanghvi and Warburg did not violate any duties to Universal under Delaware law; that to require certain disclosures in negotiations would be contrary to existing Delaware law; and that there was no violation of loyalty by Sanghvi to Universal and its stockholders.

Mr. Veasey may testify as to facts relevant in the analysis as to whether Warburg was a controller and what duties Sanghvi owed, but he may not opine as to the ultimate legal conclusions as stated above. "[I]f an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only

41

confuse the jury," *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (citation omitted) (expert's testimony as to how and to what extent directors breached their fiduciary duties was inadmissible legal opinion), and therefore would be unhelpful. Accordingly, to the extent that Mr. Veasey's opinions are legal conclusions, they are excluded.

     2.  <u>Methodology and Helpfulness to the jury</u>

Plaintiff argues that the one fact-based opinion of Veasey's regarding the purported arms-length nature of the redemption, which is not excludable as a legal opinion, is nevertheless due to be excluded as unreliable. Mr. Veasey opines that in the negotiation of the discounted redemption by Universal of Warburg's preferred stock, both sides were ably represented, and the negotiations were conducted at arms-length. Plaintiff argues that the opinion is conclusory and ignores relevant evidence including that Sanghvi was involved in every single board meeting leading up to the meeting in which the Universal Board voted on whether to approve the Wells Fargo loan. Plaintiff also argues that the Veasey opinion fails to consider the contractual control provisions in the Stockholders Agreement and downplays the fact that Sanghvi neglected to disclose the $5 million valuation to the other members of the Universal Board. While these facts may serve to undermine Mr. Veasey's opinion, they are not a basis to exclude it. Any alleged inadequacy in Mr. Veasey's analysis may be tested on cross-examination and through competing expert testimony *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Plaintiff also argues that Mr. Veasey's opinion regarding the arms-length nature of the redemption is cumulative to that of Dr. Fishkind and Ian Ratner. As discussed above, testimony will not be excluded at this juncture on the basis that it is cumulative. Mr. Veasey's experience and background with Delaware corporate law render him qualified to offer such opinion. Whether the transaction was conducted at arms-length is a fact-based inquiry, and the Court finds Mr. Veasey's professional experience and background in Delaware corporate law would be helpful to the jury in understanding the relevant facts that go into such determination. In sum, Mr. Veasey may testify regarding his opinion that the negotiation related to the stock redemption was conducted at arms-length. As for the remainder of Mr. Veasey's opinions, he may appropriately testify as to ultimate facts related to the legal issues, but he may not testify as to legal conclusions.[9]

## F.    Richard B. Gaudet

Lastly, Plaintiff moves to exclude the testimony of Defendants' expert, Richard B. Gaudet. Doc. 47. Specifically, Plaintiff argues that Mr. Gaudet is unqualified, and his underwriting and causation opinions are irrelevant, unreliable, and factually inaccurate. As for Mr. Gaudet's solvency opinion, Plaintiff seeks to exclude that as being cumulative. Doc. 47.

---

[9] Once the experts testify at trial, the Court will be able to determine at that point whether further testimony regarding an opinion should be excluded as needlessly cumulative.

In response (Doc. 53), Defendants argue that Mr. Gaudet's 40 years in commercial banking, distressed debt management, and corporate turnarounds qualify him to render the opinions he gives in this case. Defendants submit that Mr. Gaudet's opinions on Wells Fargo's underwriting go to the heart of Plaintiff's claims, are relevant, and will assist the jury in understanding what lenders do to determine a borrower's creditworthiness. Defendants further argue that Mr. Gaudet's causation opinion is directly related to Plaintiff's breach of fiduciary duty claims and is supported by reliable methodology. Regarding an insolvency opinion, Defendants submit that Mr. Gaudet is not offering such opinion. Instead, Mr. Gaudet relies on the opinions of Ian Ratner as to Universal's insolvency.

Mr. Gaudet was retained to provide opinions related to whether Wells Fargo and BankUnited complied with the usual and customary banking practices in the underwriting, approval, and serving of the February 2011 loan (the "Wells Fargo Loan") and the April 2012 loan (the "BankUnited Loan"); whether the redemption of preferred stock caused Universal's insolvency; and what caused Universal's failure. Doc. 47 at 29. Mr. Gaudet's eleven opinions related to these issues are summarized as follows:

1) Universal had cash on hand as of December 31, 2010 and March 31, 2011—immediately before and after the preferred stock redemption—that exceeded all outstanding liabilities;
2) The due diligence conducted by Wells Fargo, BankUnited, RBC Bank, Merchantil CommerceBank, and the Florida Office of Insurance Regulation similarly found that Universal was adequately capitalized at the time of redemption in February 2011;
3) Wells Fargo's underwriting met or exceeded prudent underwriting practices for loans of its size and structure in the healthcare insurance industry;

44

4) The decline in Universal's solvency following the redemption was attributable to uncontrolled and unprofitable revenue growth;

5) The Wells Fargo Loan covenants would have served the intended purpose of restricting uncontrolled growth barring inaccurate financial reporting and Universal finding less restrictive financing in April 2012;

6) Universal failed to report to Wells Fargo that it would miss its budgeted performance and would violate financial covenants, including covenants governing restrictive payments to shareholders. But for Universal management's failure to disclose these defaults to its lenders, the loan covenants would have served their intended purpose of providing early warning of problems while there was still sufficient time and capital to fix them;

7) Universal recognized, but chose to ignore, its continued financial decline into 2012 and covered it up by refinancing the Wells Fargo debt with a BankUnited Loan, which did not contain adequate restrictive covenants;

8) The BankUnited Loan structure facilitated Universal's demise by failing to abide by prudent lending and risk management practices;

9) Universal failed to disclose covenant violations and ultimately refinanced the debt without the restrictive covenants before the intended warning signs could be detected on the 2011 audited financial statements;

10) Universal's management had an objective of growth at all costs with inadequate regard for the risk incumbent to that growth. The high-risk strategy was initially tempered by Warburg through its board participation and shareholder rights and then by Wells Fargo though its restrictive covenants. Only after refinancing with BankUnited did management find itself free of constraints; and

11) Universal's failure was the result of unsustainable growth following the 2011 redemption that increased minimum statutory capital requirements, caused margins to decline to an unprofitable level, and over a two-year period eroded what had been a substantial cushion of surplus capital that existed on the redemption date in 2011.

Doc. 47 at 36–39.

Plaintiff challenges Mr. Gaudet's opinions, addressing them as three separate categories: solvency opinions; underwriting opinions; and causation opinions. Doc. 47 at 2–4. As a preliminary matter, Defendants contend that Mr. Gaudet is not being offered to opine on Universal's solvency. Doc. 53 at 20. Defense expert Ian Ratner has been retained to calculate solvency at the time of the redemption transaction based

45

upon his forensic accounting expertise. Rather, Mr. Gaudet cites to and relies on Ratner's analysis and opinion. Mr. Gaudet may appropriately rely on another expert's opinion where the reliance is not done so blindly, and he independently assesses the validity of the opinion relied upon. *See La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, 586 F. Supp. 3d 1300, 1306 (S.D. Fla. 2022). Mr. Gaudet's report and opinions include a discussion and analysis regarding solvency from a banker's perspective focused on capital adequacy. Because he is not offering his own insolvency opinion, the motion is due to be denied on that argument.

1. Qualifications

Mr. Gaudet has served as a consultant in all facets of commercial lending, including risk management, underwriting, credit analysis, credit risk review, due diligence, and business financing. Before becoming a consultant, he worked for more than 26 years in the banking industry, primarily in loan workouts and special assets. His experience includes performing forensic analysis of failed loans to determine if appropriate initial underwriting procedures would have avoided or mitigated the loss on a loan and identifying flaws in a bank's underwriting policies and procedures. Doc. 47 at 81–104; Doc. 53 at 5.

In his motion, Plaintiff challenges Mr. Gaudet's qualifications arguing that Defendants have not carried their burden of showing that Mr. Gaudet's academic and professional background are meaningful, related to the issues, or would be helpful to the jury. The Court disagrees. As discussed in the response, Mr. Gaudet's extensive banking experience, including his analyses of failed loans from the perspective of the

initial underwriting, is directly relevant to the issues raised here and will assist the jury in understanding what banks consider when loaning money to companies. Additionally, Mr. Gaudet has served as an expert witness many times in federal court and provided expert testimony related to a lender's compliance with industry, regulatory and contractual underwriting standards, as well as testified as an expert concerning the causation of a business's failure or financial decline. Mr. Gaudet is qualified to testify as an expert on the opinions he offers.

2. <u>Methodology and Helpfulness to the Jury</u>

To the extent Plaintiff challenges Mr. Gaudet's underwriting and causation opinions as being irrelevant, such challenges are without merit. At the forefront of the Plaintiff's argument is the contention that the Wells Fargo Loan caused Universal's insolvency. Mr. Gaudet's underwriting opinions squarely address this issue. Plaintiff seeks to exclude the causation opinion as an improper introduction of an affirmative defense that has not been raised in the pleadings. Mr. Gaudet's opinions as to what caused Universal's financial decline are directly relevant to rebutting Plaintiff's breach of fiduciary duty claims and defending against Plaintiff's claim that Defendants caused Universal's financial decline. Mr. Gaudet's underwriting and causation opinions are relevant.

Plaintiff argues that Mr. Gaudet's underwriting opinion must be excluded as factually inaccurate and an unsupported conclusory statement. In support of these claims, Plaintiff cites to a sentence in Mr. Gaudet's report and to testimony of Wells Fargo employees. Defendants respond that the opinions of Mr. Gaudet are factually

accurate, and they contend the testimony supports that the underwriting and approval of the Wells Fargo Loan was conducted by a team of at least eight lending professionals. Defendants cite to testimony that they argue refutes Plaintiff's position completely. These types of factual disputes are the fuel for cross examination, not a basis for wholesale exclusion of an opinion. Because the Court finds Mr. Gaudet's opinions will be helpful to the jury, the motion to exclude the opinions and testimony of Mr. Gaudet is due to be denied. Accordingly, it is

**ORDERED**:

1.      Plaintiff's Motion to Exclude the Opinions and Trial Testimony of Defendants' Expert, L. Lamar Blount (Doc. 41) is **DENIED**.

2.      Plaintiff's Motion to Exclude the Opinions and Trial Testimony of Defendants' Expert, Henry Fishkind (Doc. 42) is **DENIED**.

3.      Plaintiff's Motion to Exclude from Trial Opinions of Defendants' Expert, Samuel J. Hewitt, Regarding (I) Purported Lack of Credibility of Plaintiff's Expert Peter R. Kongstvedt, M.D. or (II) Any Opinion in his Expert Report as Unsupported or Unreliable (Doc. 43) is **DENIED**.

4.      Plaintiff's Motion to Exclude from Trial Opinions of Ian Ratner Regarding (I) Opinions Offered by Dr. Fishkind, (II) the Marshall Stevens Valuation, (III) 2015 and 2016 Payments from CMS on Account of 2012 MRA Receivables, and (IV) the Soundness and Thoroughness of the Underwriting and Due Diligence of

Wells Fargo and the Consortium of Banks for the Loan that Closed on February 14, 2011 (Doc. 44) is **DENIED**.

5.      Plaintiff's Motion to Exclude the Opinions and Trial Testimony of Defendants' Expert, E. Norman Veasey (Doc. 45) is **GRANTED in part** and **DENIED in part** as set forth herein.

6.      Plaintiff's Motion to Exclude the Opinions and Trial Testimony of Defendants' Expert, Richard B. Gaudet (Doc. 47) is **DENIED**.

7.      Should the parties choose to file dispositive motions, the parties' motions for summary judgment shall be filed on or before April 21, 2023.[10]

**DONE AND ORDERED** in Tampa, Florida on March 21, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

---

[10] To the extent the Bankruptcy Court has already issued a summary judgment ruling on certain matters, the parties should not file a motion directed to the same issues or otherwise seek to relitigate matters already addressed by the Bankruptcy Court. Additionally, in the parties' *Daubert* motions and responses and as discussed in this Order, there are clearly disputed issues of fact on certain matters. A motion brought under Fed. R. Civ. P. 56 assumes no genuine issue of material fact. Accordingly, in submitting summary judgment motions to the Court, the parties should seek summary judgment on claims or defenses for which there is no genuine issue of material fact.