# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SONEET KAPILA,

     Plaintiff,

v.                                    Case No: 8:21-cv-2362-CEH

WARBURG PINCUS, LLC,
WARBURG PINCUS EQUITY FUND
IX, L.P. and ALLEN WISE,

     Defendants.

_____/

## <u>O R D E R</u>

This matter comes before the Court on Defendants Warburg Pincus, LLC and Warburg Pincus Equity Fund IX, L.P.'s Motion for Summary Judgment. Doc. 103. Plaintiff Soneet Kapila, as Chapter 11 Liquidating Agent of the Estate of Universal Health Care Group, Inc. ("Universal"), previously the Chapter 11 Trustee of Universal, filed a response in opposition. Doc. 119. Defendants replied (Doc. 126), and the Court heard argument on the motion on November 7, 2023. Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, exhibits, stipulation of material facts, argument of counsel, and for the reasons that follow, Defendants Warburg Pincus, LLC and Warburg Pincus Equity Fund IX, L.P.'s Motion for Summary Judgment will be granted-in-part and denied-in-part.

## I.   FACTS AND BACKGROUND[1]

### A.   Stipulated Facts

Universal Health Care Group, Inc. ("Universal") was a managed-care health insurance company. Doc. 121 ¶ 1.  It operated two entities regulated by the Florida Office of Insurance Regulation ("FOIR"): Universal Health Care, Inc. ("UHC") and Universal Health Care Insurance Company ("UHCIC"). *Id.*  Dr. Akshay Desai, M.D., now deceased, was the founder, CEO, and majority owner of Universal. *Id.* ¶ 2.

Founded in 1966, Warburg Pincus, LLC ("Warburg") is a global private equity firm. *Id.* ¶ 3.  Warburg Pincus Equity IX, L.P. ("WP IX") is a limited partnership, managed by Warburg and organized for the purpose of making investments for the benefit of its limited partners. *Id.* ¶ 4.

Pursuant to the May 26, 2006, Securities Purchase Agreement ("2006 SPA"), WP IX invested $28.9 million in Universal in exchange for 11,143,871 shares of preferred stock. *Id.* ¶¶ 5, 6. Universal received regulatory approval from FOIR for the investment. *Id.* ¶ 6. On August 17, 2006, Universal stockholders executed a Stockholders' Agreement ("SA") and Universal filed an Amended and Restated Certificate of Incorporation ("COI") with the State of Delaware. *Id.* ¶ 7. The COI provided WP IX with the right to have Universal redeem its preferred stock after five

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Stipulation of Agreed Material Facts (Doc. 121). For purposes of summary judgment, the Court presents the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

years, at a price determined in the COI, subject to the terms of the COI and Delaware law. *Id.* ¶ 8. The COI also provided that WP IX's investment was entitled to an annual 12% dividend, subject to the same terms and conditions. *Id.* The agreed "Redemption Price" in the COI was $2.60233 per share plus accrued dividends, or approximately $52.1 million, subject to Delaware law. *Id.*

WP IX's initial designated directors resigned from Universal's Board on March 31, 2007. *Id.* ¶ 9. In December 2008, WP IX named Alok Sanghvi, a Warburg employee, to Universal's Board. Sanghvi served on the Board until the February 2011 redemption transaction closed. *Id.* Sanghvi negotiated the redemption of WP IX's investment in Universal on behalf of WP IX. *Id.* ¶ 10. Sandip Patel negotiated the redemption of WP IX's investment on behalf of Universal. *Id.* Sanghvi communicated with Patel toward the end of 2010 and through January 2011 concerning the proposed stock redemption. *Id.*

To fund the redemption, Universal sought and obtained financing from a syndicate of four lenders -- Wells Fargo Bank, N.A. ("Wells Fargo"); BankUnited; Mercantil Commercebank, and RBC. *Id.* ¶ 11. On January 31, 2011, the Board of Directors of Universal approved by written consent the debt financing to fund the redemption. *Id.* ¶ 12.

Pursuant to the February 7, 2011 Securities Purchase Agreement ("2011 SPA"), Universal redeemed WP IX's preferred stock for $32,286,667. *Id.* ¶ 13.

On April 6, 2012, Universal entered into a $60 million credit facility with a syndicate of five lenders – Bank United, Mercantil Commercebank, Israel Discount Bank, Capital Bank Financial Corp., and Banco de Credito e Inversiones. *Id.* ¶ 14.

In the fall of 2012, FOIR conducted an audit of UHC's and UHCIC's then-filed 2012 third quarter statutory accounting reports. In early February 2013, FOIR petitioned to place Universal's regulated subsidiaries into receivership. *Id.* ¶ 15. On February 6, 2013, Universal filed for protection under Chapter 11 of the Bankruptcy Code. *Id.* ¶ 16. On April 22, 2013, the Court appointed Plaintiff as Chapter 11 Trustee. *Id.*

### B.     Claims Against WP IX

Plaintiff asserts seven claims against WP IX in Counts one through six and nineteen for: Avoidance of (actual) Fraudulent Transfer of Property against WP IX under 11 U.S.C. § 548(a)(1) (Count I); Avoidance of (constructive) Fraudulent Transfer of Property as to WP IX under 11 U.S.C. § 548(a)(1)(B) (Count II); Avoidance of (actual) Fraudulent Transfer of Property as to WP IX under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(a) (Count III); Avoidance of (constructive) Fraudulent Transfer of Property as to WP IX under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b) (Count IV); Avoidance of (constructive) Fraudulent Transfer of Property as to WP IX under 11 U.S.C. § 544 and Fla. Stat. § 726.106(1) (Count V); Recovery of Avoided Transfer as to WP IX under 11 U.S.C. § 550 (Count VI); and Breach of Fiduciary Duty as to WP IX as Controlling Shareholder (Count XIX).

### C.   Claims Against Warburg

Plaintiff asserts the following seven claims against Warburg in Counts thirteen through eighteen and twenty: Avoidance of (actual) Fraudulent Transfer of Property (based on limited release in favor of Sanghvi) as to Warburg under 11 U.S.C. § 548(a)(1)(A) (Count XIII); Avoidance of (constructive) Fraudulent Transfer of Property (the release) as to Warburg under 11 U.S.C. § 548(a)(1)(B) (Count VXIV); Avoidance of (actual) Fraudulent Transfer of Property (the release) as to Warburg under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(a) (Count XV); Avoidance of (constructive) Fraudulent Transfer of Property (the release) as to Warburg under 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b) (Count XVI); Avoidance of (constructive) Fraudulent Transfer of Property (the release) as to Warburg under 11 U.S.C. § 544 and Fla. Stat. § 726.106(1) (Count XVII); Breach of Fiduciary Duty as to Warburg-Agency (Count XVIII); and Breach of Fiduciary Duty as to Warburg as Controlling Shareholder (Count XX).

### D.   WP IX's Investment

WP IX invested $28.9 million in Universal, which equaled approximately a 7.8% minority interest in Universal's total outstanding shares. Doc. 104-1. Universal received regulatory approval from the FOIR for the investment. Doc. 104-2. The Stockholder's Agreement ("SA") gave WP IX the right to designate up to two directors to Universal's board. Doc. 104-3 at 5–6. The SA also gave WP IX's designated directors the right to approve significant corporate actions such as approval rights over purchases in excess of $1 million. *Id.* at 7. WP IX had the contractual right to have

5

Universal redeem its preferred stock in August 2011 at a price of $52.1 million. Doc. 104-4 at 5, 24. Additionally, WP IX was entitled to an annual 12% dividend. *Id.* at 5. In the 2011 SPA, WP IX's preferred stock was redeemed for $32,286,667. Doc. 121 ¶ 13.

### E. Release in Favor of Sanghvi

The 2011 SPA included a release by Universal of "the resigning director," *i.e.* Sanghvi, "from any and all claims and causes of action of any kind by reason of any matter, event, action, inaction, or omission arising prior to the closing and shall . . . execute and deliver such other documents as is necessary or advisable to effect the foregoing." Doc. 107-2 at 6.

### F. Defendants' Motion for Summary Judgment (Doc. 103)

Defendants move for summary judgment in their favor arguing that no evidence supports that the February 2011 stock redemption was a fraudulent transfer subject to avoidance by the Plaintiff. According to Defendants, the 2011 SPA was negotiated at arms-length between sophisticated parties, and all agree that the early redemption was mutually beneficial. Defendants urge that Universal was solvent both before and after the redemption and continued to operate for two years after the redemption when Defendants were no longer involved with the company. Defendants fault Universal's CEO for Universal's financial problems, citing Desai's irresponsible decision-making, which included pursuing an unsustainable business strategy and paying millions in increased compensation to executives after the redemption. Additionally, Defendants argue that the state insurance regulator's forced receivership of Universal in early 2013

6

was based on a faulty financial analysis and deprived Universal of key revenue generating assets. Defendants contend the business judgment rule bars Plaintiff's breach of fiduciary duty claims and that the entire fairness standard is inapplicable because Sanghvi's role in the transaction was fully disclosed, Warburg and WP IX were not controllers, and the independent directors properly exercised their business judgment. Lastly, Defendants submit that Plaintiff's reliance on a deepening insolvency theory as a measure of damages is meritless because the theory has been rejected under Delaware law.

### G. Plaintiff's Response in Opposition (Doc. 119)

Plaintiff responds that disputed questions of material fact preclude summary judgment in Defendants' favor. Regarding the constructively fraudulent transfer claims, Plaintiff argues Universal received less than reasonable equivalent value (REV) for the redemption because, under former Fifth Circuit precedent, a redeeming corporation receives no value when redeeming its own shares and because Universal's Amended Certificate of Incorporation required the redeemed shares to be permanently retired and they could not be reissued, rendering the stock worthless to Universal. Next, Plaintiff argues the issue of whether Universal was rendered insolvent by the redemption presents a question of fact, as the experts who analyzed the issue for Plaintiff and Defendants reached different conclusions. Plaintiff relies on the following facts to support his expert's conclusions that Universal knew the debt being incurred to fund the redemption was a debt beyond its ability to pay as it became due: Universal's projections showing negative earnings, Universal's regulated subsidiaries'

showing their projected failure to meet statutory requirements and their projected need for capital infusions, Universal's projected failure to meet its debt covenants with Wells Fargo and BankUnited, and Universal's inability to raise new equity and debt capital as of the date of the redemption.

Regarding the actual fraudulent transfers, Plaintiff submits the Court may consider badges of fraud in determining an actual intent to hinder, delay or defraud creditors. Plaintiff identifies five badges of fraud he argues support a finding of intent or at least raise an issue of disputed fact on the matter of intent precluding summary judgment.

On the breach of fiduciary duty claims, Plaintiff argues the entire fairness standard, not the business judgment rule, applies to the claims in this case because Plaintiff alleges a breach of the duty of loyalty, not the duty of care. Plaintiff contends Sanghvi breached the duty of loyalty in at least two respects by failing to disclose Warburg's internal devaluation of Universal stock to a mere $5 million in the first quarter of 2009 and deliberately ignoring the implications of the Wells Fargo loan on Universal's financial health. Plaintiff argues that Sanghvi's dual roles as Warburg representative and Universal director created an inherent conflict of interest resulting in a breach of fiduciary duty under the entire fairness standard.

Plaintiff additionally argues that besides Defendants' vicarious liability for Sanghvi's breach of fiduciary duty, Warburg and WP IX breached their fiduciary duties as controlling shareholders of Universal. Because Warburg was on both sides of the redemption transaction and had control provisions in the Stockholder's

8

Agreement, Plaintiff contends Defendants possessed operational control that they exercised to get what they wanted, i.e., forced redemption. Plaintiff also argues that whether Delaware law recognizes a deepening insolvency cause of action is irrelevant because Plaintiff does not assert such claim here. As for deepening insolvency as a measure of damages, Plaintiff submits both Delaware and Florida recognize this theory as an appropriate measure of damages.

### H. The Parties' Experts

Both sides offer competing expert testimony on the various issues in this case in support of their respective positions. *Daubert* motions were filed challenging all experts on both sides. *See* Docs. 30, 31, 38, 41, 42, 43, 44, 45, 47. The Court's rulings on the *Daubert* motions were issued on September 23, 2022 (Doc. 75) and March 21, 2023 (Doc. 100).

### 1.   *Plaintiff's Experts*

Dr. Peter Kongstvedt is a board-certified internal medicine physician (non-practicing) with experience at senior level management of HMOs and health insurance and managed care consulting companies. He opines regarding the background and history of the Medicare Advantage (MA) program and private fee-for-service (PFFS) plans, costs associated with such plans, regulatory framework and the impact of those issues on MA and PFFS plans. Although Dr. Kongstvedt is precluded from offering an insolvency opinion or opinions regarding the ultimate financial demise of Universal because he is not an accountant, CPA, or financial expert, he is qualified to opine as to factors impacting financial stability and capital securitization requirements of a

company like Universal. Dr. Kongstvedt analyzes Universal's pricing strategy, growth, expansion, and statutory capitalization requirements in the context of the Wells Fargo loan debt acquired to fund the redemption. He opines that WP IX's decision to require a redemption and the attendant method of achieving that redemption via the Wells Fargo loan with its restrictive covenants, rapid amortization, and statutory capital multiplier, in conjunction with the changing statutory and regulatory environment, put Universal at an unreasonable risk of default. Doc. 30-2 at 7–8.

Professor Stuart Cohn is a University of Florida business law professor who offers opinions regarding corporate governance standards, practices, and obligations. Although he cannot offer the legal opinion of whether Defendants breached a fiduciary duty, he offers opinions as to evidence relevant to the issue of fiduciary duties, potential conflicts of interest, and whether Warburg was a control shareholder. He is expected to testify as to the import of information known by Warburg, such as the internal evaluation of Universal's shares, Sanghvi's failure to share that information, and Sanghvi's interests in getting WP IX out of Universal. Doc. 31-1, Doc. 75 at 22–32.

Stanley Murphy is a CPA forensic accountant with experience in damages calculations and insolvency assessment matters including cases in the health care industry. Murphy opines that Universal did not have positive market value at the time of the redemption, Universal intended to incur debt which it believed or should have believed was beyond its ability to pay, and Universal would have had unreasonably

small capital as of the date of the redemption. He further opines that total damages for breach of fiduciary duty using the deepening insolvency method are $146.8 million assuming Defendants' liability, total damages for fraudulent transfers are $33.4 million, and that the Marshall & Stevens report is unreliable. Doc. 38-6 at 9–10.

### 2.   *Defendants' Experts*

Lamar Blount is a CPA expert who opined that the FOIR's examination incorrectly determined that Universal's subsidiaries, UHC and UHCIC, overstated their Medicare and Medicaid risk-adjusted (MRA) receivables and this was an element erroneously relied on by the FOIR in determining to place the regulated subsidiaries into receivership. Doc. 55-1 at 3–4.

Dr. Henry Fishkind, Ph.D., is an economist and professor, who opines that the Warburg stock redemption was an arms-length transaction and that the early redemption produced economic benefits to Universal, including a $20 million discount on the contractually agreed redemption price, avoided Universal having to pay 12% dividends, and made $2.5 million available for operating capital from the Wells Fargo loan. Doc. 42 at 32–34.

Samuel J. Hewitt is a CPA forensic accounting expert who was retained solely to rebut the opinions of Plaintiff's expert, Dr. Peter Kongstvedt. Hewitt opines that Kongstvedt's opinion that the Wells Fargo loan put Universal at an unreasonable risk of default is unsupported, the Kongstvedt report overstates minimum statutory surplus requirements, Kongstvedt understates the ability of Universal to move funds from the regulated subsidiaries, Kongstvedt fails to acknowledge that Universal paid the Wells

Fargo loan interest and principal on a timely basis, Kongstvedt fails to consider the advantages of the discounted redemption, and Kongstvedt's opinions expect Defendants to have an unrealistic level of foreknowledge regarding financial projections and future market conditions. Doc. 43 at 95–97.

Ian Ratner is a CPA expert who opines that Universal was solvent before the stock redemption; Universal remained solvent after the redemption; the redemption was reasonable from both Universal and WP IX's view; the 2011 lending group's underwriting process and due diligence investigation before approving the loan was sound and thorough; Universal's management pursued aggressive growth after the 2011 stock redemption; Universal's bankruptcy resulted from the FOIR's actions to institute receivership proceedings against UHC and UHCIC; Murphy's opinion that Universal was insolvent is invalid; and Murphy's damage opinions are flawed. Doc. 44 at 30–33. Ratner also opines that the Marshall & Stevens valuation that Universal had positive equity greater than $91 million in August 2011 and greater than $97 million in September 2012 undermines Plaintiff's insolvency theory. Doc. 57-1 at 5–8.

Norman Veasey is a former Delaware Supreme Court Justice who will opine that the negotiations leading up to the stock redemption were conducted at arms-length, and he will further opine as to facts relevant in the analysis as to whether Warburg was a controller and what duties Sanghvi owed.[2] Doc. 45 at 35–37.

---

[2] Many of Veasey's opinions, including whether duties were breached and which legal standard applies, were excluded as impermissible legal opinions. Doc. 100 at 38–43.

Richard Gaudet is a commercial banker who offers the following opinions: Universal had cash on hand as of December 31, 2010 and March 31, 2011— immediately before and after the preferred stock redemption—that exceeded all outstanding liabilities; the due diligence conducted by Wells Fargo, BankUnited, RBC Bank, Merchantil CommerceBank, and the FOIR similarly found that Universal was adequately capitalized at the time of the redemption in February 2011; Wells Fargo's underwriting met or exceeded prudent underwriting practices for loans of its size and structure in the healthcare insurance industry; the decline in Universal's solvency following the redemption was attributable to uncontrolled and unprofitable revenue growth; the Wells Fargo Loan covenants would have served the intended purpose of restricting uncontrolled growth barring inaccurate financial reporting and Universal finding less restrictive financing in April 2012; Universal failed to report to Wells Fargo that it would miss its budgeted performance and would violate financial covenants, including covenants governing restrictive payments to shareholders; but for Universal management's failure to disclose these defaults to its lenders, the loan covenants would have served their intended purpose of providing early warning of problems while there was still sufficient time and capital to fix them; Universal recognized, but chose to ignore, its continued financial decline into 2012 and covered it up by refinancing the Wells Fargo debt with a BankUnited Loan, which did not contain adequate restrictive covenants; the BankUnited Loan structure facilitated Universal's demise by failing to abide by prudent lending and risk management practices; Universal failed to disclose covenant violations and ultimately refinanced

13

the debt without the restrictive covenants before the intended warning signs could be detected on the 2011 audited financial statements; Universal's management had an objective of growth at all costs with inadequate regard for the risk incumbent to that growth; the high-risk strategy was initially tempered by Warburg through its board participation and shareholder rights and then by Wells Fargo though its restrictive covenants; only after refinancing with BankUnited did management find itself free of constraints; and Universal's failure was the result of unsustainable growth following the 2011 redemption that increased minimum statutory capital requirements, caused margins to decline to an unprofitable level, and over a two-year period eroded what had been a substantial cushion of surplus capital that existed on the redemption date in 2011. Doc. 47 at 36–39.

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

14

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

## III.   DISCUSSION

Warburg and WP IX seek summary judgment in their favor as to the fraudulent transfer and breach of fiduciary duty claims brought against them in Plaintiff's Second Amended Complaint. Plaintiff opposes Defendants' motion, arguing that genuine issues of material fact preclude summary judgment.

### A.   Avoidance of Fraudulent Transfer Claims

Plaintiff brings several claims against the corporate Defendants, Warburg and WP IX, under state and federal law for avoidance of actual and constructively fraudulent transfers. The Bankruptcy Code contains two different statutes under which fraudulent transfers may be avoided: 11 U.S.C. §§ 548 and 544(b). Under either § 548 or § 544(b), the party alleging a fraudulent conveyance bears the burden of proof by a

15

preponderance of the evidence. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006).

Section 544(b) authorizes the avoidance of any transfer of an interest in property of the debtor that is voidable under applicable laws, including state laws. Florida's laws regarding the avoidance of fraudulent transfers are codified in the Florida Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.101, *et seq.* ("FUFTA"). Fraudulent transfer provisions like § 548 and the FUFTA are designed "to protect creditors against the depletion of a bankrupt's estate." *Gen. Elec. Credit Corp. of Tenn. v. Murphy* (*In re Rodriguez*), 895 F.2d 725, 727 (11th Cir. 1990). These provisions operate to require a transferee to return certain transfers to the debtor's estate. Transfers can be recovered either if they were made with the intent to defraud creditors (actual fraud), 11 U.S.C. § 548(a)(1)(A), or if they are constructively fraudulent, *id.* § 548(a)(1)(B).

1.   *Actual Fraudulent Transfers*

Under 11 U.S.C. § 548(a)(1)(A) of the Bankruptcy Code, "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . ." 11 U.S.C. § 548(a)(1)(A). Thus, to establish an actual fraudulent transfer claim under § 548(a)(1)(A) of the Bankruptcy

16

Code and Fla. Stat. § 726.105(1)(a),[3] "the trustee must establish: (1) the debtor 'transferred an interest in property' within the relevant pre-petition time period, and (2) the debtor made such transfer with actual intent to hinder, delay, or defraud any creditor." *In re ATM Fin. Servs., LLC*, No. 6:08-BK-969-KSJ, 2011 WL 2580763, at *4 (Bankr. M.D. Fla. June 24, 2011) (citing *In re World Vision Ent., Inc.*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002)). The timing of the transfer is not in dispute here as the stock redemption occurred within two years of Universal filing bankruptcy. However, on the second factor, "[g]iven the difficulties in establishing a transferor's actual intent, courts generally look at the totality of the circumstances and the badges of fraud surrounding the transfers." *In re World Vision Ent., Inc.*, 275 B.R. at 656; *see also In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998) (holding district court should look to existence of certain badges of fraud to determine whether the circumstantial evidence supports an inference of fraudulent intent).

Bankruptcy Code § 548 and Florida Statutes § 726.105 are substantially the same, and both address claims under the same legal framework. *See In re Toy King Distribs., Inc.*, 256 B.R. 1, 126–27, 143 (Bankr. M.D. Fla. 2000) (treating § 726.105 as state law equivalent of 11 U.S.C. § 548(a)(1)(A) and treating § 726.106 as state law equivalent of § 548(a)(1)(B)); *In re Stewart*, 280 B.R. 268, 273 (Bankr. M.D. Fla. 2001)

---

[3] Fraudulent transfer claims under Florida statutes are analogous "in form and substance" to those under 11 U.S.C. § 548 and are frequently analyzed contemporaneously. *In re Able Body Temp. Servs., Inc.*, 626 B.R. 643, 656 (Bankr. M.D. Fla. 2020) (citing *In re Pearlman*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014)). "The only material difference between the state and bankruptcy provisions is the favorable four-year look-back period under the Florida law." *In re Pearlman*, 515 B.R. at 894.

(holding that § 548 and § 726.105 "are analogous 'in form and substance,' and may be analyzed contemporaneously"). The Eleventh Circuit has adopted the badges of fraud contained in FUFTA. *In re Levine*, 134 F.3d 1046, 1053 (11th Cir. 1998). The badges of fraud include:

> (a) The transfer or obligation was to an insider.
> (b) The debtor retained possession or control of the property transferred after the transfer.
> (c) The transfer or obligation was disclosed or concealed.
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
> (e) The transfer was of substantially all the debtor's assets.
> (f) The debtor absconded.
> (g) The debtor removed or concealed assets.
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred.
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* (citing Fla. Stat. § 726.105(2)).

Defendants argue that there is no evidence of an actual intent to hinder, delay, or defraud to support a claim under 11 U.S.C. § 548(a)(1)(A) or Fla. Stat. § 726.105(1)(a). Plaintiff does not appear to dispute this, instead arguing at least five badges of fraud exist which suffice to raise genuine issues of material fact regarding evidence of intent to defeat summary judgment. First, Plaintiff cites to the fact that the transfer was made to an insider, WP IX. Doc. 119 at 19 (citing Fla. Stat. § 726.105(2)(a)). Second, Plaintiff argues that the transfer was substantially all of

Universal's assets. *Id.* (citing Fla. Stat. § 726.105(2)(e)). In support, Plaintiff relies on the projections and analysis of his CPA expert Stanley Murphy. Third, Plaintiff submits that the value of the consideration received by Universal was not reasonably equivalent to the $33.4 million transferred. *Id.* (citing Fla. Stat. § 726.105(2)(h)). Fourth, Plaintiff argues that Universal was insolvent or rendered insolvent after the transfer was made. *Id.* (citing Fla. Stat. § 726.105(2)(i)). Plaintiff's expert, Murphy, opines that Universal was insolvent following the February 2011 redemption. Fifth, Plaintiff posits the redemption occurred shortly after a substantial debt was incurred, *i.e.*, the Wells Fargo loan. *Id.* (citing Fla. Stat. § 726.105(2)(j)).

In its reply, Defendants briefly reiterate that there is no evidence of an "intent to hinder, delay, or defraud" Universal's creditors. Doc. 126 at 4. Defendants claim that no facts have been adduced to support Murphy's opinions. But other than proclaiming that there are "no badges of fraud," Defendants' reply fails to address the disputed issues of fact raised in Plaintiff's response. Even setting Murphy's opinions aside, Defendants do not address that the transfer was made to an insider after a substantial debt was incurred.

In their motion, Defendants argue that Universal received reasonably equivalent value ("REV") in the transfer and that it remained solvent after the redemption, but the facts relied upon in the motion do not establish an absence of dispute on the issues. For his part, Plaintiff relies on the testimony of Universal's Director of Finance, Jennifer Hamway, who testified that the financial projections to the banks (involved in the Wells Fargo loan) were changed multiple times because the

projections did not reflect that Universal could make enough statutory capital to service the debt and still make its debt covenant and minimum capital requirement. Doc. 119-8 at 31. Defendants contend that the Court should summarily reject Hamway's testimony as improper lay opinion and unfounded guesswork. Doc. 126 at 4 n.2. However, given her position as Universal's Director of Finance during a relevant time frame, Hamway's testimony creates a genuine issue of material fact regarding Universal's financial viability to undertake the debt financing and covenants associated with the Wells Fargo loan in order to redeem Defendants' preferred stock. Plaintiff also cites Murphy's opinion that the draft financials provided to BankUnited to obtain the 2012 loan that paid off the Wells Fargo loan were false and misleading.[4] Doc. 119-5 at 45. These facts and others raised in Plaintiff's response, *see* Doc. 119 at 4–6, demonstrate that the issues are not as clear cut as Defendants suggest. Accordingly, Defendants' motion on the actual fraudulent transfers claims is due to be denied as genuine issues of material fact exist on Plaintiff's claims brought under § 548(a)(1)(A) of the Bankruptcy Code and Fla. Stat. § 726.105(1)(a).[5]

  2.  *Constructively Fraudulent Transfers*

---

[4] In support of this opinion, Murphy relies on Universal's 2011 audited financial statements that reflect a $40.4 million negative EBITDA (a company's earnings before interest, taxes, depreciation, and amortization), compared to a $21.4 million positive EBITDA originally presented in its draft financials in March 2012 to BankUnited. Doc. 119-5 at 45, 270.

[5] The Court notes that neither party adequately addresses or develops their argument pertaining to the actual fraudulent transfer claims based upon the release provided, which is another reason the summary judgment motion is due to be denied as to the claims based on the provision of a release to Sanghvi. *See* Doc. 103 at 26 n.5.

Under 11 U.S.C. § 548(a)(1)(B), a trustee may avoid any transfer made within two years before the filing of a bankruptcy petition if the debtor;

(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; *and*

(ii)　　(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

　　(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

　　(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; *or*

　　(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B) (emphasis added). Plaintiff may defeat summary judgment by showing that genuine issues of fact exist regarding whether Universal received less than REV and that one of the four factors in 11 U.S.C. § 548(a)(1)(B)(ii) is satisfied.

FUFTA's constructively fraudulent transfers are set forth in §§726.105(1)(b) and 726.106(1). These sections are analogous "in form and substance" to § 548(a)(1)(B) of the Bankruptcy Code, and therefore are appropriately analyzed together. *See In re Villamont-Oxford Assocs. Ltd. P'ship*, 236 B.R. 467, 480 (Bankr. M.D. Fla. 1999) (citing *In re United Energy Corp.*, 944 F.2d 589, 594 (9th Cir. 1991)).

a. Reasonably Equivalent Value Under 11 U.S.C. § 548(a)(1)(B)(i)

Defendants argue that Plaintiff's claims for avoidance based upon a constructively fraudulent transfer fail because Universal received REV from the redemption. Because the 2006 COI provided WP IX with the right to have Universal redeem its preferred stock after five years based on the price contractually agreed to,

Defendants urge that Universal received REV because the stock was redeemed at a $20 million discount for $32.29 million, rather than the $52 million contractual amount. Defendants' expert Dr. Fishkind also identified additional benefits, besides the $20 million discount, including a reduction in interest rates, the removal of standard approval rights by WP IX, and the fact that the Wells Fargo loan provided $2.5 million in additional available capital to Universal. Doc. 103 at 15.

In response, Plaintiff submits that whether Universal received less than REV for the redemption is a question of fact to be decided by the jury. In support of its position that Universal received less than REV, Plaintiff relies on the Fifth Circuit's opinion in *Robinson v. Wangemann*, 75 F.2d 756 (5th Cir. 1935), for the proposition that a redeeming corporation receives no value when redeeming its own shares. As this Court previously discussed in its Order on Wise's motion for summary judgment, *Wangemann* is factually distinguishable from the instant action and a redemption used to fund *preferred stocks* may survive the "reasonably equivalent value" test. *See* Doc. 175 at 16–17.

Although *Wangemann* may not salvage Plaintiff's argument regarding REV, Plaintiff directs the Court to other evidence he relies upon to demonstrate the existence of a factual dispute. Plaintiff's expert Professor Cohn identifies potential errors in Dr. Fishkind's theory in that it presupposes Universal would have had sufficient capital in August 2011 to pay the entire $52.8 million to WP IX without running afoul of Delaware's prohibition on a corporation's ability to redeem shares of capital stock when such redemption would cause impairment of the capital. Thus, Plaintiff argues

that factual disputes exist as to whether REV was received because had Universal waited until August 2011 to redeem, it may have been unable to pay the full redemption price and thus there would have been no redemption and no payment. Plaintiff also argues that the purported "other" benefits identified by Dr. Fishkind were illusory because the fixed 4% interest owed on the Wells Fargo loan, albeit less than the 12% dividends to be paid to WP IX, was an absolute obligation, whereas the dividend payment to a shareholder ranked lower in priority. Plaintiff additionally argues that the restrictive covenants in the Wells Fargo loan were much more onerous than WP IX's control provisions that were eliminated with the redemption. Plaintiff further argues that the potential to access the $2.5 million in additional liquidity from the Wells Fargo credit was not an option, and therefore no benefit, because as of December 31, 2011, Universal was reporting negative EBITDA and was allegedly out of compliance with the required debt-to-EBITDA leverage ratios. Doc. 119 at 11 (citing Doc. 119-5 at 41). Given the factual disputes as to whether Universal received less than REV, the Court turns to the second part of the analysis.

### b. Factors Under § 548(a)(1)(B)(ii)

The second part of the analysis considers whether Universal (1) became insolvent as a result of the redemption; (2) was engaged in a transaction that left it with unreasonably small capital; (3) incurred debts that would be beyond its ability to pay as such debts matured; or (4) made such transfer to or for the benefit of an insider. *See* 11 U.S.C. § 548(a)(1)(B)(ii). These factors are in the disjunctive meaning the Plaintiff

need only establish one, in addition to showing REV is disputed, to defeat summary judgment.

Defendants argue that Universal was neither insolvent nor rendered insolvent by the redemption. Under the Bankruptcy Code, insolvency is defined as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation. . . ." 11 U.S.C. § 101(32).[6] In support, Defendants rely on Universal's December 2010 audited financial statements and the Ernst & Young "going concern" opinion. Additionally, Defendants cite to their expert, Ian Ratner, who performed a valuation of Universal as of the date of the redemption and opined that Universal's invested capital exceeded interest-bearing liabilities by $170.8 million, which was more than sufficient to pay its debts. Universal's CFO Dennis Kant executed a Solvency Certificate in February 2011. Defendants additionally cite to the Marshall & Stevens report that concluded the fair market value of Universal's total equity as of August 15, 2011, was $91 million. Doc. 103 at 16–17, 24. Lastly, Defendants rely on the independent evaluation conducted by the four banks who participated in the $40 million financing as part of the Wells Fargo loan, which was used to fund the redemption.

On the second factor, the unreasonably small capital test "analyzes whether at the time of the transfer the company had insufficient capital, including access to credit, for operations." *In re EBCI, Inc.*, 380 B.R. 348, 359 (Bankr. D. Del. 2008). Relying on

---

[6] Similarly, Florida Statutes provide that a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Fla. Stat. § 726.103(1).

the same evidence referenced above, Defendants argue that Plaintiff cannot establish Universal had unreasonably small capital. In further support, Defendants point to the fact that Universal continued to successfully operate for two years after the redemption.

Lastly,[7] Defendants argue that there is no evidence that Universal incurred debts beyond its ability to repay, as evidenced by the fact that it timely paid interest and principal payments on the Wells Fargo loan which was fully repaid by June 2012. Defendants also rely on the testimony of Universal's former CFO who stated that Universal paid all its bills and debts as they came due.

In response, Plaintiff first argues that the issue of insolvency is a disputed question of fact for the jury. Murphy has proffered opinions, using the balance sheet test, that conclude Universal was insolvent. In support of this opinion, Plaintiff cites to Universal's projections showing negative earnings, Universal's regulated subsidiaries' showing their projected failure to meet statutory requirements and their need for capital infusion; Universal's failure to meet its debt covenants, and Universal's inability to raise new equity and debt capital as of the date of the redemption. Based on Murphy's analysis, Universal failed to meet its debt covenants with Wells Fargo starting in the fourth quarter of 2011 and there were warning signs that Universal had no real prospect of being able to repay the Wells Fargo loan. Plaintiff acknowledges that Defendants' expert Ian Ratner reached a different result

---

[7] Neither Defendants' motion nor Plaintiff's response addresses the fourth factor, *see* 11 U.S.C. 548(a)(1)(b)(ii)(IV), that transfer was made to or for the benefit of an insider.

regarding Universal's solvency at the time of the redemption. Given these factual disputes, Defendants' motion for summary judgment on the constructively fraudulent transfer claims is due to be denied.

### B.      Breach of Fiduciary Duty Claims

Plaintiff sues WP IX for breach of fiduciary duty as a controlling shareholder in Count XIX. Plaintiff sues Warburg for breach of fiduciary duty based on an agency theory for the actions of Sanghvi in Count XVIII and as a controlling shareholder in Count XX. Defendants move for summary judgment on these claims arguing the business judgment rule bars Plaintiff's claims, entire fairness does not apply because the Universal directors were not beholden to Defendant, and no material facts exist to support either of Plaintiff's theories of liability: agency or control.

"When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review." *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014). "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct." *In re Trados Inc. S'holder Litig. (Trados II )*, 73 A.3d 17, 35–36 (Del. Ch. 2013).

1.      *Standards of Review*

When analyzing breach of fiduciary duty claims, Delaware courts apply one of "three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Trados II*, 73 A.3d at 43 (quoting *Reis v.*

26

*Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)). "The standard of review supplies the appropriate lens through which the court evaluates whether the defendants complied with their fiduciary obligations." *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 713 (Del. Ch. 2023). Which standard of review applies will depend initially on whether the board members:

> (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness).

*Trados II*, 73 A.3d at 36. The standards are discussed below. [8]

a. Business Judgment Rule

The business judgment rule is Delaware's default standard. *In re Ultimate Escapes Holdings, LLC*, 551 B.R. 749, 761 (D. Del. 2016*), aff'd sub nom. In re Ultimate Escapes Holdings LLC*, 682 F. App'x 125 (3d Cir. 2017) (citing *Trados II*, 73 A.3d at 43). Under

---

[8] Neither party asserts that Delaware's intermediate standard of enhanced scrutiny applies. Delaware courts have described enhanced scrutiny to arise in "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decision-making context can subtly undermine the decisions of even independent and disinterested directors." *Trados II*, 73 A.3d at 43. Delaware case law supports that enhanced scrutiny is inapplicable where the transaction "did not effectuate a change of control, is not a merger agreement, a final stage transaction, or any of the 'specific recurring, and readily identifiable situations' in which courts apply enhanced scrutiny." *Ultimate Escapes Holdings*, 551 B.R. at 777 (quoting *Trados II*, 73 A.3d at 43). This stock redemption of a minority shareholder's preferred shares is not the type of transaction that is a final stage or fundamental change of corporate control in which Delaware courts have applied the intermediate standard of enhanced scrutiny.

this rule, a court will not second-guess the fiduciary's decision if it has any rational business purpose, even if the decision ends up being flawed in hindsight. *See In re Dollar Thrifty S'holders Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010); *Kahn v. Roberts*, 1995 WL 745056, (Del. Ch. 1995). "The business judgment rule is not actually a substantive rule of law, but instead it is a presumption that in making a business decision the directors of a corporation acted on an informed basis and in the honest belief that the action taken was in the best interests of the company [and its shareholders]." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746–47 (Del. Ch. 2005) ("*Walt Disney I*") (internal quotation marks and citations omitted). "This presumption applies when there is no evidence of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment on the part of the directors." *Id.* at 747 (internal quotation marks and citations omitted. When a plaintiff fails to rebut the presumption of the business judgment rule, the plaintiff is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste.[9] *Id.* (citing *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780 (Del. Ch. 1988)); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("A plaintiff may overcome the presumption that directors and officers

---

[9] "A claim of waste refers to 'an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.'" *Kaufman v. Allemang*, 70 F. Supp. 3d 682, 696 (D. Del. 2014) (quoting *White v. Panic*, 783 A.2d 543, 554 (Del. 2001)). "To prevail on a waste claim . . . the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *White*, 783 A.2d at 554 n.36. "[T]he decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *Stanziale v. Nachtomi* (*In re Tower Air, Inc.*), 416 F.3d 229, 238 (3d Cir. 2005).

acted in good faith by establishing that a decision was so egregious as to constitute corporate waste.").

### b. Entire Fairness

The entire fairness test has been described as Delaware's most onerous standard of review, and it applies when a director labors under an actual conflict of interest. *Trados II*, 73 A.3d at 44. Once a court determines that entire fairness applies, a defendant is charged with establishing "that the transaction was the product of both fair dealing *and* fair price." *Id.* at 44 (quoting *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor III*), 663 A.2d 1156, 1163 (Del. 1995)).

### 2. *Business Judgment Rule Applies to Plaintiff's Fiduciary Claims*

Plaintiff seeks to overcome application of the business judgment rule by arguing that Sanghvi was a conflicted director who stood on both sides of the transaction and because Warburg and WP IX were controlling shareholders in a conflicted transaction. Because business judgment is the default standard, the burden is on the Plaintiff to show that this standard rule is inapplicable. *In re HH Liquidation, LLC*, 590 B.R. 211, 272 (Bankr. D. Del. 2018) (citing *Solomon v. Armstrong*, 747 A.2d 1098, 1111–12 (Del. Ch. 1999) ("Under the business judgment rule, the burden of pleading and proof is on the party challenging the decision to allege facts to rebut the presumption."). A plaintiff faces "an uphill battle" to carry this burden of proof. *In re Crimson Expl. Inc. S'holder Litig.*, No. 8541-VCP, 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014). And "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task." *In re Tower Air*, 416 F.3d at 238. As discussed below, Plaintiff fails to

carry his burden of rebutting the presumption on either of his theories of Sanghvi as a conflicted director or Defendants as controlling shareholders, and thus the business judgment rule applies to the Court's analysis of the redemption decision.

a. Actual Conflict

Entire Fairness does not apply because there is no direct conflict. *See Trados II*, 73 A.3d at 44. Plaintiff seeks to invoke this standard arguing Sanghvi's working both sides of the transaction created a conflict. In support, he cites to the fact that Sanghvi was a director for Universal while negotiating the redemption as the representative for Warburg. However, as Defendants point out, Sanghvi abstained from the vote, his role in the transaction was fully disclosed, and Sanghvi was not acting as a director in the transaction.

In his response, Plaintiff argues that because his claims are based on Sanghvi's breach of loyalty, there is no safe harbor under Delaware law when a fiduciary holds dual roles. In support, he contends Sanghvi breached his duty of loyalty in two material ways. First, he argues Sanghvi failed to disclose to Universal Warburg's reduced internal valuations to $5 million in the first quarter of 2009. Second, he argues Sanghvi violated his fiduciary duty by deliberately choosing to ignore the implications of the Wells Fargo loan on Universal's financial health. Doc. 119 at 21.

On the first issue, Plaintiff's argument is unavailing. Delaware law does not obligate a director to disclose internal valuations. In *Klang v. Smith's Food & Drug Centers., Inc.*, 702 A.2d 150, 157 (Del. 1997), the Delaware Supreme Court noted that

accounting estimates are immaterial and need not be disclosed. In *Barkan v. Amsted Indusries, Inc.*, 567 A.2d 1279 (Del. 1989), that court explained why this is so:

> Even the best estimate constitutes an exercise in enlightened speculation …. We see no reason why candor would demand that shareholders be deluged with conflicting estimates of financial performance, many of which have been made stale by the passage of time. … [T]he duty to disclose requires that a corporation … give shareholders up-to-date financial estimates that provide a reasonable basis for an informed investment decision.

*Id.* at 1298. Because equity valuations are not predictors of market value, *Klang*, 702 A.2d at 157, Sanghvi's failure to disclose the 2009 valuation (which was two years before the redemption)[10] did not make Sanghvi a conflicted director in order to trigger entire fairness review.

Second, Plaintiff argues that Sanghvi ignored the implications of the Wells Fargo loan and failed to warn Universal against it. In support, Plaintiff points to (1) Sanghvi's repeated reference to Warburg's desire to exit its investment in Universal; (2) Sanghvi's communications with Wells Fargo regarding the status of financing without a Universal representative on the call; (3) Sanghvi's last-minute objection to a 2008 financing deal by KPP; (4) a 2009 Oppenheimer memo reflecting that Warburg vetoed the KPP financing deal due to its desire to exit Universal; (5) Sanghvi purportedly "slow-walked" financing deals in order to maintain leverage to force a

---

[10] Plaintiff further argues Sanghvi's failure to disclose the internal valuation was material because Bess Weatherman testified that Warburg carried the valuation on its books until the redemption. But it does not change the fact that such internal valuations are not a predictor of fair market value, and therefore did not create an actual conflict.

redemption on terms acceptable to them; (6) Sanghvi did not consider how Universal was going to service the loan and in an email to a colleague in December 2020, he states Warburg did not care about the terms of Universal's financing as long as they were able to raise the money to get Warburg out of the investment; and (7) Sanghvi never suggested getting a fairness opinion for the redemption. Doc. 119 at 22–24. As evidence of Sanghvi's conflicted status, Plaintiff also cites to the fact that Sanghvi received a large bonus and resigned immediately following the redemption transaction.

Defendants respond that Plaintiff fails to overcome the applicability of the Delaware Supreme Court's decision in *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114 (Del. 2006), which provides that a director, with full disclosure, may act for a counterparty in a transaction. Plaintiff does not dispute that Sanghvi's role in the transaction was disclosed to Universal. Doc. 103-2 at 9. As Sanghvi's role was fully disclosed to the board, Defendants urge there was no actual conflict. The Court agrees. Defendants further contend that Universal was committed to "take out" Warburg since 2009 and was the one seeking an early redemption. Doc. 105-9. Universal's independent directors determined it was in the company's best interest because the redemption amount was less than face value. Doc. 105-4 at 159; Doc. 106-8. The fact that Defendants wanted to exit their investment as well did not negate that it was in Universal's best interest. Plaintiff argues Sanghvi repeatedly pushed for an early redemption. Even accepting this as true, pursuant to the COI, Defendants could not demand redemption before August 2011. Doc. 104-4 at 24. Moreover, under Delaware

law, Defendants cannot "force" a redemption if Universal did not have the funds. *See* 8 Del. C. § 160(a)(1) (Delaware corporate law preludes a corporation from redeeming preferred shares of stock if the capital on the company is impaired). Significantly, Plaintiff's own expert Professor Cohn acknowledged that Universal believed the financing to fund the redemption was in Universal's best interest. Doc. 119-3 at 33. Thus, Plaintiff fails to show Sanghvi had an actual conflict to trigger the entire fairness standard.[11]

### b. Controlling Shareholders

Plaintiff, alternatively, seeks to invoke entire fairness review based on the fact that Warburg and WP IX were controlling shareholders. "One circumstance that can trigger entire fairness review is when a controlling shareholder engages in a 'conflicted transaction.'" *HH Liquidation*, 590 B.R. at 272 (citing *In re: Crimson Expl. S'holder Litig.*, 2014 WL 5449419 at *12). However, the presence of a controlling shareholder alone is insufficient to require application of the entire fairness standard. *HH Liquidation*, 590 B.R. at 272. Instead, a plaintiff must also show the controlling shareholder either: "(a) stood on both sides of the transaction at issue, or (b) 'compete[d] with the common [shareholder]' by obtaining a personal benefit that the other shareholders did not receive." *Id.* (citing *Crimson Expl.*, at *14). ("In sum, triggering entire fairness review requires the controller or control group to engage in a conflicted transaction. The

---

[11] Further, Plaintiff's contention that fairness review applies based on *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983), is unavailing, given the significant factual distinctions, as discussed in Defendants' reply. See Doc. 126 at 7.

conflicted transaction could involve standing on both sides of the transaction . . . or receiving different consideration than other stockholders.").

In Delaware, a shareholder will be considered "controlling" if it "either owns more than 50% of the voting power of the company, or exercises 'actual control' over the board of directors during the course of a particular transaction." *Zimmerman v. Crothall*, 62 A.3d 676, 699–700 (Del. Ch. 2013). As Defendants only had a 7.8% interest in Universal, Defendants argue they had no control and cannot be held liable under this theory. It is undisputed that Desai was the majority (69%) shareholder in Universal. Docs. 103-2 at 3; 103-3 at 2. Plaintiff responds that Defendants need not be majority shareholders to be controlling shareholders. While the most direct way for a plaintiff to demonstrate control is to show that a defendant holds a majority of a corporation's voting power, "[m]athematical voting control, however, is only one method of establishing controller status." *Tornetta v. Musk*, –A.3d–, No. 2018-0408-KSJM, 2024 WL 343699, at *44 (Del. Ch. Jan. 30, 2024). Plaintiff fails to direct the Court to any authority to support that a less than 8% shareholder is a controlling shareholder. Relevant to this analysis, Defendants did not have any vote related to the redemption or financing for it, as Sanghvi abstained. Thus, the issue turns to whether Defendants, through Sanghvi or otherwise, exercised actual control over the transaction. To show actual control, Plaintiff must demonstrate that "although lacking a clear majority, [the shareholders] have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control." *Zimmerman*, 62 A.3d at 700.

34

On the issue of control, Plaintiff submits that, given Warburg's position on both sides of the redemption transaction coupled with the extensive control provisions in the Stockholders' Agreement, there is ample evidence in the record to defeat Defendants' motion on these claims. In his response to Defendants' motion, Plaintiff offers the following facts as evidence of Warburg and WP IX's status as controlling shareholders: resignation of Warburg's designated directors from the Board resulted in difficulties managing critical functions of Universal because of certain actions that required affirmative consent by WP IX's chosen director; a June 2007 internal Warburg memo reflected its intent to reappoint directors to the Board in order to exert more influence; Sanghvi acknowledged that he received confidential business information in his capacity as WP IX's designated director on Universal's Board; and an August 2008 memo from Tenno Tsai, another former Warburg designated member of Universal's Board, which states that Warburg has the right to block payment based on provisions in the Stockholders' Agreement and the ability to block future debt issuances and a public offering. Doc. 119 at 27–29. Plaintiff's offer of proof falls short.

On the one hand, Plaintiff argues that Defendants exercised control by not appointing a director to the board. In the next sentence, he cites to Defendants' appointment of a director to the board as evidence of Defendants' assertion of control. These arguments are circular and unpersuasive.

Defendants submit that control is lacking because Sanghvi abstained from voting and the Board was controlled by Dr. Desai who owned nearly 70% of Universal's shares. Additionally, Defendants urge that WP IX's contractual rights

were obtained in an arms-length transaction and exercise of a standard contract right does not render WP IX a controller.

The SA allowed for WP IX to appoint up to two directors to Universal's board. WP IX's exercise of its standard contractual rights does not, standing alone, make it a controller. *See In Superior Vision Servs., Inc. v. ReliaStar Life Ins.*, No. 1668-N, 2006 WL 2521426, at *4–5 (Del. Ch. Aug. 25, 2006) (where plaintiff's allegations of control were based on the defendant exercising its contractual rights for its own purposes was, without more, not sufficient to allege [defendant] is a controlling shareholder bound by fiduciary obligations). Similarly, the 2008 memo referencing WP IX's intent to exercise its contractual right related to the approval of financing does not confer controller status on an otherwise minority shareholder. Regarding Plaintiff's claim that Sanghvi received confidential business information in his capacity as WP IX's designated director on Universal's Board, Plaintiff admits in interrogatory responses that WP IX was allowed to ask and was provided access to information regarding Universal's finances and projections. Doc. 103-2 at 9.

As discussed above, Sanghvi was not in an actual conflict situation. His involvement in the redemption on behalf of Warburg was fully communicated to the Universal board, and significantly, Sanghvi did not participate in the vote related to the Wells Fargo financing deal or the redemption. Plaintiff's reliance on the appointment of a director and the non-appointment of a director is not persuasive. While the Court previously recognized that whether a corporation is controlling is a fact-intensive inquiry, on the record here Plaintiff fails to come forward with material

facts to demonstrate that Defendants were controlling or that this was a conflicted transaction.

c. Disinterested and Independent Board

Notwithstanding Plaintiff's arguments that Sanghvi is conflicted and that Defendants are controlling, which the Court finds lacking, in order for Plaintiff to obtain review under the entire fairness test, Plaintiff must prove that there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority. *Trados II*, 73 A.3d at 44; *see also Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (where a plaintiff alleging a duty of loyalty breach is unable to establish facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence, the entire fairness standard of review is not applied and the Court respects the business judgment of the board). Plaintiff fails to do so, which is further support for a finding that the business judgment rule applies here.

At the hearing on the motion for summary judgment, Plaintiff summarily argued that Desai and his family members (who were 70% shareholders) were not independent and disinterested, but he fails to come forward with evidence demonstrating such. In contrast, Defendants have submitted evidence that Universal sought out the redemption as early as 2009, the company was represented by independent counsel in the transaction, the directors thought the redemption was in Universal's best interest, and the board minutes reflect a unanimous approval of the financing to fund the redemption. Plaintiff also argued at the motion hearing that the

37

Desai family, as common shareholders, were no longer disinterested or independent because additional preferred stock was being issued to Warburg whenever quarterly interest payments to Defendants were not made, which was diluting their common shares. This argument was not raised in Plaintiff's briefing, and thus is waived. But, even accepting this statement as true, Plaintiff fails to establish that the remaining shareholders were beholden to Defendants or that the transaction was not in the best interest of Universal. In light of that, Plaintiff cannot establish that entire fairness applies. *See Puma v. Marriott*, 283 A.2d 693, 695 (Del. Ch. 1971) (where no showing of domination of other directors, business judgment rule applied). Thus, Plaintiff's proffer does not establish the remaining directors' lack of independence which is needed to invoke entire fairness review.

Because Plaintiff does not rebut the presumption that the business judgment rule applies to the redemption decision here, the Court applies this standard in considering Plaintiff's breach of fiduciary claims.

3.   *Breach of Fiduciary Duty Claims*

A claim for breach of fiduciary duty "requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *In re NewStarcom Holdings*, Inc., 547 B.R. 106, 118 (Bankr. D. Del. 2016), aff'd, 608 B.R. 614 (D. Del. 2019), *aff'd sub nom. In re NewStarcom Holdings Inc.*, 816 F. App'x 675 (3d Cir. 2020). Under Delaware law, directors "owe two fiduciary duties—care and loyalty."[12] *Id.*

---

[12] Previously, Delaware courts identified three separate duties. *See Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001) ("The directors of Delaware corporations have a triad of primary

(quoting *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 32–33 (Del. Ch. 2014)). At the hearing on Defendants' motion for summary judgment, Plaintiff clarified that he is proceeding only under a breach of the duty of loyalty claim, not under a breach of care claim. As such, Plaintiff contends Defendants may not rely upon a safe harbor provision.[13]

The duty of loyalty "requires that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *NewStarcom*, 547 B.R. at 118 (citation omitted). A breach of the duty of loyalty is established if plaintiff can show that "a self-interested transaction occurred and that the transaction was unfair to the shareholders." *In re USDigital, Inc.*, 443 B.R. 22, 41 (Bankr. D. Del. 2011).

Since the Court has determined that the business judgment rule applies, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar*

---

fiduciary duties: due care, loyalty, and good faith."). But the Delaware Supreme Court has since clarified that good faith is not a separate fiduciary duty but rather a subsidiary element or condition of the duty of loyalty. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 118 (Bankr. D. Del. 2016), *aff'd*, 608 B.R. 614 (D. Del. 2019), *aff'd sub nom. In re NewStarcom Holdings Inc.*, 816 F. App'x 675 (3d Cir. 2020) (holding the requirement to act in good faith is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty").

[13] Section 102 provides in pertinent part that a company's certificate of incorporation may not contain a provision that limits the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty where such provision seeks to eliminate or limit the liability of "(i) A director . . . for any breach of the director's . . . duty of loyalty to the corporation or its stockholders." See Del. Code tit. 8, § 102(b)(7).

*Thrifty S'holder Litig.*, 14 A.3d at 598. Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty. Courts have described business judgment rule as providing "something as close to non-review as our law contemplates." *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013). This standard of review "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation." *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d at 34 (quoting *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009)).

Applying this standard to Plaintiff's claims, the Court must defer to the business judgment of Universal's directors to manage the corporation's affairs.[14] Even considering the facts in a light most favorable to Plaintiff, under this deferential standard, the Court cannot say that the redemption decision lacks any rational basis.[15] Thus, Plaintiff's breach of fiduciary duty claims fail.

### C.   Deepening Insolvency Theory of Damages

Stan Murphy is Plaintiff's CPA expert who applied the deepening insolvency theory of damages for the period from June 1, 2011 through December 31, 2012, as the measure of damages on Plaintiff's breach of fiduciary duty claims. Doc. 114-4 at 109–13. Based on his analysis, Murphy opines that the damages incurred by Plaintiff due to Defendants' breaches of fiduciary duty equal $146.8 million.

---

[14] Plaintiff wholly fails to address the business judgment rule in his briefing.

[15] Perhaps recognizing the near-Herculean task, Plaintiff did not argue that its breach of fiduciary claims should survive summary judgment under the business judgment standard of review.

Defendants move for summary judgment as to Plaintiff's deepening insolvency theory arguing such theory has been rejected under Delaware law. Doc. 103 at 40–42. It is clear that Delaware law does not recognize a separate cause of action for deepening insolvency. *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.,* 906 A.2d 168, 205 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007); *see also In re Midway Games Inc.*, 428 B.R. 303, 316 (Bankr. D. Del. 2010), on reconsideration in part (Mar. 19, 2010) (rejecting deepening insolvency as a valid claim). In rejecting the theory as an independent cause of action, the Delaware Chancery states that "Delaware law imposes no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to liquidate. Even when the company is insolvent, the board may pursue, in good faith, strategies to maximize the value of the firm." *Trenwick Am. Litig. Tr.*, 906 A.2d at 204. Citing *Trenwick* and the Third Circuit's opinion in *Seitz v. Detweiler, Hershey and Assoc., P.C.* (*In re CitX Corp., Inc.*), 448 F.3d 672, 678 (3d Cir. 2006), the Delaware Bankruptcy court rejected deepening insolvency as a theory of damages. *See In re Troll Communications, LLC*, 385 B.R. 110, 122 (Bankr. D. Del. 2008).

Plaintiff argues that the *Troll* case is unpersuasive because that court relied on a decision that was factually distinguishable and applied Pennsylvania (not Delaware) law. Instead, Plaintiff relies on the 2008 Delaware Bankruptcy court decision that distinguished the Third Circuit's *In re CitX* opinion and agreed with the Trustee that deepening insolvency is a valid theory of damages on a breach of fiduciary duty claim under Delaware law. Doc. 119 at 30 (citing *In re Brown Schools*, 386 B.R. 37, 48 (Bankr.

D. Del. 2008)). Defendants respond that the *Brown Schools* case is an outlier that is limited to a narrow set of facts not applicable here.

Neither Plaintiff nor Defendants have cited Delaware Supreme Court precedent on the issue of whether deepening insolvency is an appropriate measure of damages on Plaintiff's breach of fiduciary duty claim, and the Court's own research has not uncovered a definitive answer from Delaware's highest court. In a recent opinion from the District of Hawaii, that court, after conducting a comprehensive review of the case law addressing this issue, similarly recognized that Delaware law is somewhat unsettled as to the viability of deepening insolvency as a measure of damages. *See Kane v. PaCap Aviation Fin., LLC*, No. CV 19-00574 JAO-RT, 2022 WL 3446314 (D. Haw. Aug. 17, 2022) (collecting cases and predicting that the Supreme Court of Delaware would accept deepening insolvency as a damages theory).

Given the unsettled status of Delaware law and the Court's above conclusions that Plaintiff's breach of fiduciary duty claims do not survive summary judgment, the Court need not reach the issue of whether deepening insolvency is a viable and appropriate measure of damages under Delaware law for the claims asserted here.

## IV.   CONCLUSION

Because genuine issues of material fact exist, Defendants Warburg Pincus, LLC and Warburg Pincus Equity Fund IX, L.P.'s Motion for Summary Judgment (Doc. 103) as to Plaintiff's actual fraudulent transfer claims (Counts I, III, XIII, XV), Plaintiff's constructively fraudulent transfer claims (Counts II, IV, V, XIV, XVI, XVII) and as to Plaintiff's claim for recovery of avoided transfer under § 550 (Count VI) will

be denied. Defendants' motion as to the breach of fiduciary duty claims (XVIII, XIX, XX) will be granted. Accordingly, it is

**ORDERED**:

1.     Defendants Warburg Pincus, LLC and Warburg Pincus Equity Fund IX, L.P.'s Motion for Summary Judgment (Doc. 103) is **granted-in-part** and **denied-in-part**.

2.     Defendants' motion is **granted** as to the breach of fiduciary duty claims in Counts XVIII, XIX and XX. In all other respects, Defendants' motion is **denied**.

3.     The Court defers ruling on the pending motions *in limine* (Docs. 132–134, 137, 138, 140–145). A hearing on the motions *in limine* will be scheduled closer in time to the trial date.

4.     On or before **April 15, 2024**, the parties shall confer and file a joint notice regarding their trial availability in October, November, December 2024, and January through October 2025. The joint notice should include the number of days expected for trial.

**DONE AND ORDERED** in Tampa, Florida on March 31, 2024.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties, if any